CITY OF ASHEVILLE, a municipal corporation, Plaintiff v. STATE OF NORTH CAROLINA, and COUNTY OF BUNCOMBE, et al., Defendants

No. COA07-516

(Filed 19 August 2008)

**1. Appeal and Error— Supreme Court decision—dispositive**

Although plaintiff City of Asheville argues that *Candler v. City of Asheville*, 247 N.C. 398, incorrectly decided the issues at the time and is not dispositive of any issue in the present case, the Court of Appeals has no authority to overrule decisions of the Supreme Court.

**2. Appeal and Error— prior opinion—not overruled**

In an action involving rates for customers of the Asheville water distribution system who live outside the Asheville city limits, the Court of Appeals held that *Candler v. City of Asheville*, 247 N.C. 398 was not overruled by language in *Piedmont Aviation, Inc. v. Raleigh-Durham Airport Authority*, 288 N.C. 98.

**3. Collateral Estoppel and Res Judicata— res judicata—constitutionality claim—not raised in prior case**

In an action involving a series of session laws concerning City of Asheville water rates (Sullivan I, II, and III), the City was precluded by res judicata from challenging Sullivan I under any provision of the North Carolina Constitution because it litigated

1

the constitutionality of Sullivan I in *Candler v. City of Asheville*, 247 N.C. 398 (1958). Even though it now contends that *Candler* decided different constitutional questions, the current claims could have been raised in *Candler*.

4. **Collateral Estoppel and Res Judicata— collateral estoppel—series of session laws on same subject—constitutional challenge to one—subsequent challenge to others on different provisions**

In an action involving a series of session laws concerning City of Asheville water rates (Sullivan I, II, and III), the City was not precluded by collateral estoppel from challenging the constitutionality of Sullivan II and III under a particular provision of the North Carolina Constitution by its failure in an earlier case to argue that Sullivan 1 violated that provision.

5. **Cities and Towns; Constitutional Law— North Carolina Constitution—water system—local acts not involving health and sanitation**

Session laws concerning the City of Asheville water system and its relationship with surrounding areas (Sullivan I, II, and III) were local acts but were not prohibited by Article II, Section 24, Clause 1 of the North Carolina Constitution as involving health and sanitation. The plain language of Sullivan II indicates that it relates only to economic matters; the mere implication of water or a water system in a legislative enactment does not necessitate a conclusion that it relates to health and sanitation in violation of the Constitution. Sullivan III's legislative purpose is not inconsistent with Sullivan II to a certainty, and any reasonable doubt must be resolved in favor of presumed constitutionality.

6. **Cities and Towns; Constitutional Law— North Carolina Constitution—water system—local acts not involving trade**

Session laws concerning the City of Asheville water system and its relationship with surrounding areas (Sullivan II, and III) were local acts but were not prohibited by Article II, Section 24, Clause 1 of the North Carolina Constitution as involving trade. Asheville, acting in its proprietary capacity to operate the water distribution system, is not a citizen of the State engaging in trade for the purpose of Article II, Section 24 of the North Carolina Constitution.

CITY OF ASHEVILLE v. STATE

[192 N.C. App. 1 (2008)]

**7. Cities and Towns— water system—surrounding area—session laws limiting proprietary decisions**

Session laws involving the operation of the City of Asheville water system (Sullivan II and III) did not impermissibly intrude on the decision-making authority of Asheville under the North Carolina Constitution with respect to its purely proprietary and private activities. While these session laws preclude certain decisions regarding Asheville citizens and customers outside the city limits, judges are not legislators.

**8. Appeal and Error— brief—argument abandoned**

Asheville abandoned on appeal its contention that session laws concerning its water system violated the law of the land clause in the North Carolina Constitution by not presenting and discussing that argument in its brief. As the challenging party, Asheville had the burden of establishing the unconstitutionality of the statute.

**9. Cities and Towns; Constitutional Law— North Carolina Constitution—session law—local water system—not an exclusive emolument**

Modifications to N.C.G.S. § 160A-312(a) under a session law (Sullivan III) do not violate the prohibition on exclusive emoluments in the North Carolina Constitution. Those modifications do not confer an exclusive benefit on water consumers located outside Asheville's corporate limits which is not already shared by water consumers located within Asheville's corporate limits.

Appeal by plaintiff from order entered 2 February 2007 by Judge Howard E. Manning, Jr. in Wake County Superior Court. Heard in the Court of Appeals 4 February 2008.

*Robert W. Oast, Jr., City Attorney for the City of Asheville, and Moore & Van Allen, PLLC, by Daniel G. Clodfelter, Mark A. Nebrig, T. Randolph Perkins, and Jeffrey M. Young, for plaintiff-appellant.*

*Roy Cooper, Attorney General, by Mark A. Davis, Special Deputy Attorney General, and W. Dale Talbert, Special Deputy Attorney General, for defendant-appellee State of North Carolina.*

*Long, Parker, Warren & Jones, P.A., by W. Scott Jones, and Robert B. Long, Jr., for defendants-appellees Buncombe defendants.*

*Andrew L. Romanet, Jr., General Counsel, and Gregory F. Schwitzgebel, III, Senior Assistant General Counsel, for North Carolina League of Municipalities, amicus curiae.*

MARTIN, Chief Judge.

Plaintiff City of Asheville ("Asheville") appeals from the trial court's 2 February 2007 order denying its motion for summary judgment, granting cross-motions for summary judgment by the State of North Carolina and the County of Buncombe with several affiliated officials and individuals (with the State of North Carolina, collectively "defendants"), and dismissing the action.

According to the parties' Amended Complaint and Answers, Asheville operates and at least partially owns a water treatment and distribution system for the treatment and supply of water for drinking, cooking, and cleaning purposes, and for the operation of sanitary disposal systems for individuals and entities within its corporate limits and for some individuals and entities outside of its corporate limits. According to the September 2005 certified Water System Management Plan from Asheville's Water Resources Department, Asheville operates this water distribution system as a public enterprise. The system "serves all of the City of Asheville, approximately 60% of Buncombe County and less than 1% of Henderson County. The major water supply is the City's watershed, which is comprised of 20,000 acres of mountainous forestland in eastern Buncombe County." "The water distribution system . . . is comprised of over 1,200 miles of transmission and service lines, 24 pump stations, 21 storage reservoirs, and associated equipment. [Asheville's] watershed, treatment plants, transmission and service lines, pumping stations and reservoir storage systems combine to make th[e] system one of the largest in North Carolina."

This case arises out of Asheville's desire to "determine the rates it would charge to supply water to customers located outside the Asheville city limits" unencumbered by any "restrictions . . . [or] requirements imposed on Asheville resulting from the passage and enforcement" of three session laws (collectively "the Sullivan Acts") enacted by the North Carolina General Assembly: (1) House Bill 931, Chapter 399 of the 1933 Public-Local Laws (hereinafter

"Sullivan I"); (2) House Bill 1065, Session Law 2005-140 (hereinafter "Sullivan II"); and (3) House Bill 1064, Session Law 2005-139 (hereinafter "Sullivan III").

Sullivan I, captioned "An Act to Regulate Charges Made by the City of Asheville for Water Consumed in Buncombe County Water Districts," provides:

> SECTION 1. That from and after the passage of this act it shall be unlawful for the City of Asheville or any of the governing authorities, agents, or employees, thereof, to charge, exact, or collect from any resident of Buncombe County, whose property is now connected or may hereafter be connected with the main of any water district which has paid or issued bonds for the payment of the expense of laying such main, a rate for water consumed higher than that charged by the City of Asheville to persons residing within the corporate limits of said city.

> SEC. 2. That the City of Asheville is hereby specifically authorized and empowered, through its officers, agents and employees, to cause any user of water who shall fail to pay promptly his water rent for any month to be cut off, and his right to further use of water from the city system to be discontinued until payment of any water rent arrearages.

> SEC. 3. That it is the purpose and intent of this act to declare that persons residing outside of the corporate limits of the City of Asheville shall be entitled to the use of Asheville surplus water only, and the governing body of the City of Asheville is authorized and empowered to discontinue the supply of water to any districts, or persons, out of the corporate limits of the City of Asheville at any time that there may be a drought or other emergency, or at any time the governing body of the City of Asheville may deem that the city has use for all of its water supply.

> SEC. 4. That it shall be the duty of the County Commissioners of Buncombe County and/or the trustees of the different water districts operating outside of the corporate limits of the City of Asheville, in Buncombe County, to maintain the water lines in proper repair in order that there may not be a waste of water by leakage.

Sullivan Act, ch. 399, 1933 N.C. Public-Local Laws 376.

Sullivan II, captioned "An Act Regarding Water Rates in Buncombe County," provides:

SECTION 1. From and after the effective date of this act, it shall be unlawful for the City of Asheville, or any of the governing authorities, agents, or employees thereof, to charge, exact, or collect from any water consumer in Buncombe County currently or hereafter connected to the waterlines currently maintained by the Asheville/Buncombe Water Authority, and replacements, extensions, and additions thereto a rate for water consumed higher than the rate charged for the same classification of water consumer residing or located within the corporate limits of the City of Asheville. Classification of water consumer as referred to herein means the type of facility to which the water is provided (e.g., single-family residence, multiple-family residence, retail, commercial, industrial) without regard to geographic location within Buncombe County.

SECTION 2. The City of Asheville may, through its officers, agents, and employees, cause any user of water who shall fail to pay promptly his water rent for any month to be cut off and his right to further use of water from the city system to be discontinued until payment of any water rent arrearages, all consistent with G.S. 160A-314(b).

SECTION 3. It shall be the duty of the Board of Commissioners of Buncombe County and/or the trustees of the different water districts operating outside of the corporate limits of the City of Asheville in Buncombe County to maintain the waterlines owned by the County of Buncombe and such water districts in proper repair in order that there may not be a waste of water by leakage.

SECTION 4. To the extent that the Sullivan Act (Chapter 399 of the Public-Local Laws of 1933) does not conflict with this act, it continues to apply.

Sullivan II, ch. 140, 2005 N.C. Sess. Laws 246-47.

Finally, Sullivan III, captioned "An Act Regarding the Operation of Public Enterprises by the City of Asheville" and enacted on the same day as Sullivan II, modified N.C.G.S. §§ 160A-312, 160A-31(a), and 160A-58.1(c). The only section of Sullivan III at issue in the present case modifies N.C.G.S. § 160A-312 to provide, in relevant part:

(a) A city shall have authority to acquire, construct, establish, enlarge, improve, maintain, own, operate, and contract for the operation of any or all of the public enterprises as defined in this Article to furnish services to the city and its citizens

and other areas and their citizens located outside the corporate limits of the city. Subject to Part 2 of this Article, a city may acquire, construct, establish, enlarge, improve, maintain, own, and operate any public enterprise outside its corporate limits, within reasonable limitations.

(b) A city shall have full authority to protect and regulate any public enterprise system belonging to or operated by it by adequate and reasonable rules. The rules shall be adopted by ordinance, and shall comply with all of the following:

    (1) The rules shall apply equally to the public enterprise system both within and outside the corporate limits of the city.

    (2) The rules may not apply differing treatment within and outside the corporate limits of the city.

    (3) The rules shall make access to public enterprise services available to the city and its citizens and other areas and their citizens located outside the corporate limits of the city equally.

    (4) The rules may prioritize the continuation of the provision of services based on availability of excess capacity to provide the service.

    (5) The rules may be enforced with the remedies available under any provision of law.

. . . .

(d) A city shall account for a public enterprise in a separate fund and may not transfer any money from that fund to another except for a capital project fund established for the construction or replacement of assets for that public enterprise. Obligations of the public enterprise may be paid out of the separate fund. Obligations shall not include any other fund or line item in the city's budget.

Sullivan III, ch. 139, 2005 N.C. Sess. Laws 243-44.

Our discussion of the issues involved in this case would not be complete without some historical background. The history of this case began over eighty years ago. Asheville's City Manager Gary W. Jackson, Asheville's Director of the Water Resources Department David Hanks, Buncombe County's representative in the State Senate

Martin L. Nesbitt, Jr., Buncombe County's Finance Director Donna Clark, certified public accountant G. Edward Towson, II, and Buncombe County's Assistant County Manager and Director of Planning Jon Creighton provided testimony by sworn affidavits regarding the history of the development, ownership, construction, maintenance, and operating costs of the water distribution system and the Asheville/Buncombe Water Authority.

As set out more fully in *Candler v. City of Asheville*, 247 N.C. 398, 400-04, 101 S.E.2d 470, 471-75 (1958), which chronicled the first thirty-five years of the history of this case, with the increase in development in Asheville and Buncombe County, between 1923 and 1927, pursuant to acts of the General Assembly, six water and sewer districts were formed in Buncombe County. *See id.* at 400, 101 S.E.2d at 471. As the trial court stated, "[t]hese districts had certain geographical boundaries outside the City of Asheville and were authorized to acquire rights of way for water and sewer lines, to construct the lines, and hold elections authorizing the issuance of bonds paying therefor." Citing *Candler*, the court further stated that "[t]he districts did issue the bonds and build water lines for the distribution of the water, which lines were connected to the water system initially established by the City of Asheville." The record also establishes that each of the six districts was a body politic, governed and administered by its own trustees who determined policy.

Following Asheville's "land boom" and the Depression at the end of the 1920's, all local governments in Buncombe County and all of the water and sewer districts were bankrupted. The Buncombe County Commissioners, who also served as trustees of the various water districts, levied taxes to pay the principal and interest on the bonds issued by the water districts within the districts, and to pay for the maintenance of the water and sewer lines as provided by Sullivan I. *See id.* at 401, 101 S.E.2d at 472. According to the record, "[i]n 1936, the local governments in [Buncombe] County took actions required to refinance all defaulted bonds, both of the local governments and the districts." "County Commissioners, in their role as trustees, determine[d] the tax rate to be levied within each district to provide funds for the maintenance of the water and sewer lines and to amortize the debt."

According to the affidavits of Asheville's City Manager Jackson and Buncombe County's Assistant County Manager and Director of Planning Creighton, in 1960, Asheville annexed portions of the territory of the original water districts and thereby assumed $396,000.00

in bonded indebtedness as a pro-rata share of the existing principal balance from the water districts for areas annexed into Asheville that year. According to Jackson, "[w]hen Asheville and Buncombe County defaulted on their bonded indebtedness during the Great Depression, the water district indebtedness was part of the consolidated indebtedness that was refinanced through refunding bonds . . . . Th[is] debt was finally paid off in 1976." (Citations omitted.)

Jackson stated in his affidavit that, "[i]n 1980, following the final payment and satisfaction of all the water district debt and the refunding debt from the Great Depression, the Asheville City Council passed a resolution authorizing the filing of a declaratory judgment action challenging the validity of Sullivan I." According to Jackson, as well as Buncombe County's State Senator Nesbitt, in November 1980, an interlocal agreement was reached between Asheville and Buncombe County with an effective date of 29 October 1981 "relating to water service in Buncombe County," establishing the Asheville/Buncombe Water Authority, and relating to additional "matters of local governmental concern . . . including parks and recreation and law enforcement." According to Jackson's affidavit, this interlocal agreement and its subsequent amendments (hereinafter "the Water Agreement") "contained a specific provision whereby Asheville specifically agreed not to challenge Sullivan I's constitutionality while the [Water Agreement was] in force." Jackson stated that, as a result of the provisions of the Water Agreement, the City ultimately did not file the declaratory judgment action.

The affidavits of Jackson and Nesbitt also show that, in compliance with the provisions of Sullivan I, the 1981 Water Agreement also "required Asheville to charge the same water rates for the same classes of customers within and outside of the City limits," even though Asheville began charging the same water rates following the Court's decision in *Candler* in 1958, and continued to do so until it terminated the Water Agreement in accordance with its express terms effective 30 June 2005.

According to Creighton, from 1957 through 1981, Buncombe County "carried out its obligations under [Sullivan I] to maintain [the] waterlines owned by the County primarily by making payments to the City of Asheville for maintenance of the lines" and, from 1981 through 2005, to the Asheville/Buncombe Water Authority pursuant to the Water Agreement. As reflected in the affidavit of Buncombe County's Finance Director Clark and supporting exhibits, from July 1973 through June 1998, Buncombe County "contributed $26,435,201.00

towards the construction, upkeep and other costs of the Asheville Buncombe Water System. Of that amount, $1,932,834.00 were grant funds." Per Clark and Creighton, for the fiscal years from 1982 through 2005, when Buncombe County held title to various public recreational facilities pursuant to the Water Agreement until its termination by Asheville in 2005, Buncombe County's capital expenditures on those facilities was $9,025,715.00. As Nesbitt stated, during the period from October 1981 through June 2005, "the water system had in fact been allowed to fall farther into disrepair while [Asheville] and, to a lesser extent, Buncombe County were taking money from the water system."

As indicated in Jackson's affidavit, "[i]n accord with the provisions of [the Water Agreement] and effective upon its termination, . . . certain water lines and facilities conveyed to Asheville reverted to [Buncombe] County." According to Nesbitt's affidavit and the 30 September 2005 Agreement Between the City of Asheville and Buncombe County for Water System Maintenance and Repair entered into after the enactment of Sullivan II and III, the parties do not dispute that the South Buncombe pump station and storage tank are owned by Buncombe County and, pursuant to the 1981 Water Agreement, the ownership of all water system facilities conveyed to Asheville "were to be re-conveyed to the County of Buncombe and its water districts following termination of the Water Agreement." However, the parties are not otherwise in agreement about the current ownership of the water system facilities that make up the water distribution system.

On 11 October 2005, Asheville filed its Amended Complaint for Declaratory Judgment against the State of North Carolina challenging the constitutionality of the Sullivan Acts. On 13 March 2006, the State of North Carolina filed its Answer to Amended Complaint seeking dismissal of Asheville's complaint and a declaration that the Sullivan Acts are constitutional. On 18 July 2006, the County of Buncombe with several affiliated officials and individuals (collectively "Buncombe defendants") filed a Motion to Intervene and an Answer to Asheville's complaint seeking a dismissal of the action and, in the alternative, a declaration of the constitutionality of the Sullivan Acts. In September 2006, the trial court granted Buncombe defendants' Motion to Intervene.

On 12 July 2006, Asheville filed its Motion for Summary Judgment. On 2 January and 5 January 2007, respectively, the State of North Carolina and Buncombe defendants filed their own Motions for

Summary Judgment. After a hearing on 16 January 2007, the trial court entered its Memorandum of Decision and Order on 2 February 2007, concluding as a matter of law that the Sullivan Acts are constitutional "in that (A) they are a valid exercise of legislative authority, (B) they are not local acts in violation of Article II, Section 24 of the North Carolina Constitution and (C) Sullivan I, II and III do not violate Article I, Section 19 of the North Carolina Constitution." The court also "reject[ed] the arguments by the City of Asheville that: (1) the Sullivan Acts are unconstitutional under the rule announced in *Asbury v. Town of Albemarle*, 162 N.C. 247[, 78 S.E. 146] (1913); and (2) that Sullivan III unconstitutionally creates special privileges for an ineligible class of persons in violation of the exclusive emoluments prohibition contained in Article I, Section 32 of the North Carolina Constitution." Accordingly, the court denied Asheville's motion for summary judgment and granted defendants' cross-motions for summary judgment. Asheville filed its notice of appeal to this Court on 27 February 2007.

---

The record on appeal contains ten assignments of error, eight of which have been brought forward in appellant's brief. The remaining two assignments of error not brought forward in appellant's brief are not discussed below and are deemed abandoned. *See* N.C.R. App. P. 28(b)(6) (2008) ("Immediately following each question [in appellant's brief] shall be a reference to the assignments of error pertinent to the question, identified by their numbers and by the pages at which they appear in the printed record on appeal. Assignments of error not set out in the appellant's brief . . . will be taken as abandoned.").

"On appeal, an order allowing summary judgment is reviewed *de novo*." *Tiber Holding Corp. v. DiLoreto*, 170 N.C. App. 662, 665, 613 S.E.2d 346, 349 (citing *Summey v. Barker*, 357 N.C. 492, 496, 586 S.E.2d 247, 249 (2003)), *disc. review denied*, 360 N.C. 78, 623 S.E.2d 263 (2005). "Further, the evidence presented by the parties must be viewed in the light most favorable to the non-movant." *Bruce-Terminix Co. v. Zurich Ins. Co.*, 130 N.C. App. 729, 733, 504 S.E.2d 574, 577 (1998). " 'The purpose of summary judgment . . . [is] to bring litigation to an early decision on the merits without the delay and expense of a trial where it can be readily demonstrated that no material facts are in issue.' " *Barnhill Sanitation Serv., Inc. v. Gaston County*, 87 N.C. App. 532, 536, 362 S.E.2d 161, 164 (1987) (quoting *Kessing v. Mortgage Corp.*, 278 N.C. 523, 533, 180 S.E.2d 823, 829 (1971)), *disc. review denied*, 321 N.C. 742, 366 S.E.2d 856 (1988).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2007). Although determining what constitutes a genuine issue of material fact is "often difficult," our Supreme Court has stated that "an issue is genuine if it is supported by substantial evidence, and an issue is material if the facts alleged would constitute a legal defense, or would affect the result of the action, or if its resolution would prevent the party against whom it is resolved from prevailing in the action." *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002) (citations omitted) (internal quotation marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and means more than a scintilla or a permissible inference." *Id.* (citations omitted) (internal quotation marks omitted).

I.

**[1]** Asheville contends the trial court erred by concluding that the Sullivan Acts were enacted pursuant to a valid exercise of legislative authority, arguing instead that the Legislature exceeded the constitutional limitations on its authority under Article II, Section 24, Clause 1, Subclauses (a) and (j), Article I, Section 19, and Article I, Section 32 of the North Carolina Constitution. Before addressing Asheville's arguments, in response to defendants' briefs, we must first determine whether Asheville's contention that the Sullivan Acts are unconstitutional and were not enacted pursuant to a valid exercise of legislative authority is precluded by the doctrines of res judicata or collateral estoppel.

In *Candler*, the Court heard an action in which similarly-situated Buncombe defendants sued then-defendant Asheville "to restrain [Asheville] from putting into effect an ordinance which provide[d] a higher rate for consumers of water living outside the City than that charged to consumers residing in the City [in alleged contravention to Sullivan I]." *Candler*, 247 N.C. at 399, 101 S.E.2d at 471. In *Candler*, the Court unanimously held:

> *In our opinion*, in light of all the facts and circumstances revealed on this record, *the Legislature had the power to enact [Sullivan I], and that such Act is constitutional and valid and is binding on the City of Asheville* insofar as it pertains to the right to sell water to persons, firms, and corporations who obtain

water through mains constructed and maintained at the expense of the taxpayers in these water or water and sewer districts. *We further hold that such Act does not violate Section 17, Article I, of the Constitution of North Carolina,* or the Fourteenth Amendment to the Constitution of the United States.

*Id.* at 411, 101 S.E.2d at 479 (emphasis added). We find no ambiguity in the plain language of the Court's holding that Sullivan I was "constitutional and valid and [wa]s binding on the City of Asheville" and "further hold[ing] that such Act d[id] not violate Section 17, Article I, of the Constitution of North Carolina." *Id.* However, Asheville argues that *Candler* "incorrectly decided the issues" that were before the North Carolina Supreme Court at the time, was "not good law when it was decided," and "cannot be dispositive of any issue" in the present case. Nonetheless, this Court "has no authority to overrule decisions of [the] Supreme Court and [has] the responsibility to follow those decisions until otherwise ordered by the Supreme Court." *Dunn v. Pate,* 334 N.C. 115, 118, 431 S.E.2d 178, 180 (1983) (alterations in original) (internal quotation marks omitted).

**[2]** Asheville next argues that *Candler* has since been overruled by *Piedmont Aviation, Inc. v. Raleigh-Durham Airport Authority,* 288 N.C. 98, 215 S.E.2d 552 (1975), asserting that *Piedmont Aviation* rejected *Candler's* "minor premise" which "rests on a conceptual confusion about rate-setting" that the power to establish rates to be charged by a municipal utility to its consumers is a governmental function, not a proprietary one. We disagree and conclude that *Candler* is still binding authority on the constitutionality of Sullivan I.

In *Piedmont Aviation,* several airlines ("petitioners") challenged a municipal airport authority (the "Authority") alleging that the Authority's action to increase landing fees and space rental charges at the airport was unreasonable and discriminatory. *See Piedmont Aviation,* 288 N.C. at 99, 105, 215 S.E.2d at 552-53, 556. The issue before the Court was whether petitioners were entitled to judicial review of the Authority's determination about the establishment of the landing fees. *See id.* at 100, 215 S.E.2d at 553. The Court held that "the fixing by the Authority of the fees it will charge for the use of its property is not an 'administrative decision' . . . and the procedure provided . . . for the obtaining of judicial review of 'administrative decisions' is not applicable thereto." *Id.* at 105, 215 S.E.2d at 556.

Almost twenty years earlier in *Candler*, the Court stated: "It is clear that the power to establish rates is a governmental function and not a proprietary one." *Candler*, 247 N.C. at 407, 101 S.E.2d at 477. In *Piedmont Aviation*, however, after stating that "[a] municipality operating an airport acts in a proprietary capacity," *Piedmont Aviation*, 288 N.C. at 102, 215 S.E.2d at 555, the Court made the following singular reference to *Candler*:

> Thus, in determining the fee it will charge for the privilege of landing an aircraft upon its runway and the rent it will charge for the use of its properties, the Authority is acting as the proprietor of the property, not as a regulatory agency. *The statement* in *Candler v. Asheville*, 247 N.C. 398, 101 S.E.2d 470, to the effect that a municipality in establishing rates it will charge for water is exercising a governmental function *was not necessary to the decision in that case, is not supported by the authorities cited therefor and may no longer be deemed authoritative.* That statement [in *Candler*] overlooks *the distinction to be drawn between municipal action fixing rates to be charged by a public utility to its customers* and municipal action fixing rates which the municipality, itself, will charge for its service. *The former function is a governmental function.* The latter is a proprietary function.

*Id.* at 102-03, 215 S.E.2d at 555 (emphasis added) (citations omitted). From the Court's plain language that the statement it corrected in *Candler* "was not necessary to the decision in that case," *Piedmont Aviation* did not overrule *Candler*. Therefore, we conclude that *Candler* is still binding authority regarding the constitutionality of Sullivan I. *See Dunn*, 334 N.C. at 118, 431 S.E.2d at 180.

[3] Asheville finally argues that *Candler* does not dispose of this case because it "decided an altogether different constitutional question"; namely, that the challenge to Sullivan I in *Candler* was presented under Article I, Section 17 of the 1868 Constitution and under the Fourteenth Amendment of the U.S. Constitution. Again, we must disagree.

The doctrine of res judicata embodies the general rule that "any right, fact, or question in issue and directly adjudicated on or necessarily involved in the determination of an action before a competent court . . . on the merits is conclusively settled by the judgment therein and cannot again be litigated between the parties and privies." *Gaither Corp. v. Skinner*, 241 N.C. 532, 535, 85 S.E.2d 909, 911 (1955).

The general rule is that "[a] final judgment rendered by a court of competent jurisdiction, on the merits, is conclusive as to the rights of the parties and their privies, and as to them constitutes an absolute bar to a subsequent action involving the same claim, demand, and cause of action." *Id.* (internal quotation marks omitted). However, "[i]t is to be noted that the phase of the doctrine of *res judicata* which precludes relitigation of the same cause of action is broader in its application than a mere determination of the questions involved in the prior action." *Id.* "The bar of the judgment in such cases extends not only to matters actually determined, but also to other matters which in the exercise of due diligence could have been presented for determination in the prior action." *Id.* at 535-36, 85 S.E.2d at 911; *see also* Black's Law Dictionary 1337 (8th ed. 2004) ("[T]he effect of foreclosing any litigation of matters that never have been litigated[] because of the determination that they should have been advanced in an earlier suit . . . has gone under the name, 'true res judicata,' or the names, 'merger' and 'bar.' ") (quoting Charles Alan Wright, *The Law of Federal Courts* § 100A, at 722-23 (5th ed. 1994)).

The Court's rationale for this doctrine is as follows:

The judgment or decree of a Court possessing competent jurisdiction is final as to the subject-matter thereby determined. The principle extends further. *It is not only final as to the matter actually determined but as to every other matter which the parties might litigate in the cause, and which they might have had decided. . . .* This extent of the rule can impose no hardship. It requires no more than a reasonable degree of vigilance and attention; a different course might be dangerous and often oppressive. It might tend to unsettle all the determinations of law and open a door for infinite vexation. The rule is founded on sound principle. . . . The plea of *res judicata* applies, except in special cases, not only to the points upon which the Court was required by the parties to form an opinion and pronounce judgment but to every point which properly belonged to the subject in litigation and which the parties, exercising reasonable diligence, might have brought forward at the time and determined respecting it.

*Piedmont Wagon Co. v. Byrd*, 119 N.C. 460, 462-63, 26 S.E. 144, 145 (1896) (emphasis added) (first omission in original) (internal quotation marks omitted). This approach continues to prevail in our appellate courts one hundred years later:

The court requires parties to bring forward the whole case, and will not, *except under special circumstances*, permit the same parties to open the same subject of litigation in respect to matters which might have been brought forward as part of the subject in controversy. . . . The plea of *res adjudicata* applies, . . . not only to the points upon which the court was required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject in litigation and which the parties, exercising reasonable diligence, might have brought forward at the time and determined respecting it.

*Edwards v. Edwards*, 118 N.C. App. 464, 471-72, 456 S.E.2d 126, 131 (1995) (first omission in original) (quoting *In re Trucking Co.*, 285 N.C. 552, 560, 206 S.E.2d 172, 178 (1974)).

The parties in the present case do not dispute either that a final judgment on the merits was reached in *Candler* or that there is an identity of the parties and their privies between the present case and *Candler*. However, we are not persuaded by Asheville's argument that *Candler* is not binding authority on the present case "because it decided an altogether different constitutional question." In its brief in *Candler*, then-defendant Asheville answered then-plaintiffs' (now Buncombe defendants') complaint by alleging that Sullivan I violated Article I, Section 17 (present Article I, Section 19), and Article I, Section 7 (present Article I, Section 32) of the North Carolina Constitution. In its brief for the present case, Asheville again argues that Sullivan I violates these same constitutional provisions. Additionally, in its *Candler* brief, Asheville did not allege or argue that Sullivan I violated Article II, Section 29 (present Article II, Section 24), although it asserts this claim today. Since (1) Asheville has already litigated Sullivan I's constitutionality under Article I, Section 19 and Article I, Section 32 of the North Carolina Constitution in *Candler*, (2) Asheville *could have asserted* Sullivan I's unconstitutionality under former Article II, Section 29 at the time of the action in *Candler but chose not to do so*, and (3) the Court held that Sullivan I was "constitutional and valid and [wa]s binding on the City of Asheville" in spite of Asheville's arguments to the contrary, *see Candler*, 247 N.C. at 411, 101 S.E.2d at 474, we conclude that Asheville is precluded under the doctrine of res judicata from challenging the constitutionality of Sullivan I under any provision of the North Carolina Constitution in the present case. Our decision renders it unnecessary to address Asheville's remaining assignments of error regarding the constitutionality of Sullivan I, or to address defendants'

contention that Asheville is collaterally estopped from challenging the constitutionality of Sullivan I.

[4] While defendants did not argue that Asheville is collaterally estopped from litigating the constitutionality of Sullivan II and Sullivan III under Article I, Section 19 or Article I, Section 32 of the North Carolina Constitution, defendants present arguments that Asheville is collaterally estopped from litigating the constitutionality of challenging Sullivan II and III under Article II, Section 24. We disagree.

"The companion doctrines of *res judicata* (claim preclusion) and collateral estoppel (issue preclusion) have been developed by the courts for the dual purposes of protecting litigants from the burden of relitigating previously decided matters and promoting judicial economy by preventing needless litigation." *Bockweg v. Anderson*, 333 N.C. 486, 491, 428 S.E.2d 157, 161 (1993). Again, "[w]here the second action between two parties is *upon the same claim*, [the doctrine of res judicata allows] the prior judgment [to] serve[] as a bar to the relitigation of all matters that *were or should have been* adjudicated in the prior action." *Id.* at 492, 428 S.E.2d at 161 (emphasis added). " 'But where the second action between the same parties is *upon a different claim* or demand, the judgment in the prior action operates as an *estoppel only as to those matters in issue* or points controverted, upon the determination of which the finding or verdict was rendered.' " *King v. Grindstaff*, 284 N.C. 348, 356, 200 S.E.2d 799, 805 (1973) (emphasis added) (quoting *Cromwell v. County of Sac*, 94 U.S. 351, 353, 24 L. Ed. 195, 198 (1877)). In other words, "the prior judgment serves as a bar *only as to issues actually litigated* and determined in the original action." *Bockweg*, 333 N.C. at 492, 428 S.E.2d at 161 (emphasis added). "[A]n issue is 'actually litigated,' for purposes of collateral estoppel or issue preclusion, if it is properly raised in the pleadings or otherwise submitted for determination and [is] in fact determined." 47 Am. Jur. 2d *Judgments* § 494 (2006). "A very close examination of matters actually litigated must be made in order to determine if the underlying issues are in fact identical. If they are not identical, then the doctrine of collateral estoppel does not apply." *Beckwith v. Llewellyn*, 326 N.C. 569, 574, 391 S.E.2d 189, 191, *reh'g denied*, 327 N.C. 146, 394 S.E.2d 168 (1990).

In the present case, in its brief and reply brief, Asheville repeatedly asserts that it neither "raised, briefed, [n]or argued" that Sullivan I violated former Article II, Section 29 (present Article II, Section 24) of the North Carolina Constitution. Asheville argues that the Court in

*Candler* was not presented with, nor did it decide, the issue of whether Sullivan I was an invalid local act under present Article II, Section 24. Defendants agree that Asheville did not argue that Sullivan I was unconstitutional under former Article II, Section 29 in *Candler.* Thus, as we concluded above, the fact that Asheville *could have* alleged a violation of this constitutional provision in *Candler* is the reason Asheville is precluded by res judicata, *not* collateral estoppel, from making that same constitutional claim today. Consequently, as Asheville contended in oral argument before this Court, *its failure to argue* that Sullivan I violated this constitutional provision to the *Candler* Court *must also mean* that the issue of whether Sullivan II and Sullivan III violate Article II, Section 24 was not actually litigated in *Candler,* was not necessary to the Court's determination that Sullivan I was constitutional, and is not precluded under collateral estoppel in the present case. We agree.

However, defendants argue that *Candler,* nonetheless, is still binding authority on the question of whether Sullivan I was constitutional under former Article II, Section 29. In *Candler,* the Court stated a fundamental rule that no party in the present case disputes: "Section 4, Article VIII, [present Article VII, Section 1] of our Constitution does not forbid the Legislature from passing special acts, amending charter of cities, towns, and incorporated villages, or conferring upon municipal corporations additional powers, or restricting the powers theretofore vested in them." *Candler,* 247 N.C. at 409, 101 S.E.2d at 478. In support of its statement, the Court cited four cases: *Kornegay v. City of Goldsboro,* 180 N.C. 441, 105 S.E. 187 (1920); *Holton v. Town of Mocksville,* 189 N.C. 144, 126 S.E. 326 (1925); *Webb v. Port Commission,* 205 N.C. 663, 172 S.E. 377 (1934); and *Deese v. Town of Lumberton,* 211 N.C. 31, 188 S.E. 857 (1936). The *Candler* Court next excerpted language from *Kornegay* and *Holton* to provide additional support for this statement.

In *Holton,* the plaintiff, a property owner in the town of Mocksville, appealed from the trial court's denial of her motion for nonsuit concerning "whether upon all the evidence the plaintiff's lots had been lawfully assessed and whether or not the amounts levied against them were valid liens" "because there was no petition signed by the owners of lots abutting on the street directed to be improved by the resolution," as was required by a statute of general applicability. *Holton,* 189 N.C. at 148, 126 S.E. at 328. At trial, defendant offered into evidence chapter 86, Private Laws 1923, entitled "An act relating to the financing of street and sidewalk improvements in the town of

CITY OF ASHEVILLE v. STATE

[192 N.C. App. 1 (2008)]

Mocksville" which provided that "[the] board of commissioners [of the town of Mocksville] shall have power to levy special assessments as herein provided [i.e., without petition]" as required by the statute. *See id.* at 149, 126 S.E. at 328 (alterations in original). On appeal, plaintiff "attack[ed] the constitutionality of the act, contending [(1)] that by section 4 of Article VIII of the Constitution of North Carolina, the General Assembly was without power to enact it, and [(2)] that the act [wa]s void because [it was] retroactive and retrospective." *Id.* The *Holton* Court disposed of the issue regarding the constitutionality of the Mocksville act in one paragraph, the text of which was excerpted in full by the *Candler* Court. Again, in *Candler*, the Court included the following paragraph from *Holton* in support of its statement in *Candler* that former Article VIII, Section 4 does not forbid the Legislature from passing special acts or conferring powers upon, or restricting powers of, a municipality:

> Section 4 of Article VIII of the Constitution imposes upon the General Assembly the duty to provide by general laws for the improvement of cities, towns and incorporated villages. It does not, however, forbid altering or amending charters of cities, towns and incorporated villages or conferring upon municipal corporations additional powers or restricting the powers theretofore vested in them. We find nothing in section 4, Article VIII of the Constitution rendering this act unconstitutional, *nor does the act relate to any of the matters upon which the General Assembly is forbidden by section 29 of Article II to legislate. Kornegay v. Goldsboro,* 180 N.C. 441, 105 S.E. 187 (1920).

*Candler,* 247 N.C. at 410, 101 S.E.2d at 478-79 (emphasis added) (quoting *Holton,* 189 N.C. at 149, 126 S.E. at 328-29). Defendants point to the *Candler* Court's excerpted language from *Holton*—"nor does the act relate to any of the matters upon which the General Assembly is forbidden by section 29 of Article II to legislate"—to support the argument that *Candler* determined that Sullivan I was constitutional under former Article II, Section 29. We do not agree. Based on the facts that (1) the constitutionality of Sullivan I under Article II, Section 29 was not an issue before the *Candler* Court, (2) the location and context of the *Holton* quotation in *Candler* was plainly citing relevant, foundational law regarding the Legislature's powers under the Constitution, and (3) nowhere else in *Candler* does the Court ever mention, let alone examine, former Article II, Section 29, we are not convinced by defendants' arguments that the Court held that Sullivan I was constitutional under present Article II, Section 24 in *Candler*.

We hold the trial court erred when, in reliance on this language in *Candler* excerpted from *Holton*, it concluded "as a matter of law that the provisions and limitations imposed on the City of Asheville in [the Sullivan Acts we]re within the power of the Legislature to enact" because "*Candler* ma[de] clear that none of the Sullivan Acts at issue in this litigation are prohibited by Article II, Section 24 of the Constitution." Therefore, we hold that Asheville is not precluded under the doctrine of collateral estoppel from challenging the constitutionality of Sullivan II and Sullivan III under Article II, Section 24 of the North Carolina Constitution in the present case.

II.

**[5]** The trial court concluded that, while the Sullivan Acts are local acts, none are prohibited by Article II, Section 24 of the Constitution because, as a matter of law, the Sullivan Acts "do not relate to health and sanitation and do not regulate trade." While Asheville agrees that the Sullivan Acts are local acts, it contends the trial court erred by concluding that none of the Sullivan Acts at issue in this litigation are prohibited by Article II, Section 24.

Article VII, Section 1 of the North Carolina Constitution provides, in part:

The General Assembly shall provide for the organization and government and the fixing of boundaries of counties, cities and towns, and other governmental subdivisions, and, except as otherwise prohibited by this Constitution, may give such powers and duties to counties, cities and towns, and other governmental subdivisions as it may deem advisable.

N.C. Const. art. VII, § 1. In other words, "[m]unicipalities have no inherent powers; they have only such powers as are delegated to them by legislative enactment." *In re Ordinance of Annexation No. 1977-4*, 296 N.C. 1, 16-17, 249 S.E.2d 698, 707 (1978). Additionally, as cited in Asheville's brief, "municipalities 'are creatures of the legislature, public in their nature, subject to its control, and have only such powers as it may confer[;] . . . powers [which] may be changed, modified, diminished, or enlarged, and, subject to the constitutional limitations, conferred at the legislative will.' " *Candler*, 247 N.C. at 407, 101 S.E.2d at 477 (quoting *Holmes v. City of Fayetteville*, 197 N.C. 740, 150 S.E. 624 (1929), *appeal dismissed per curiam*, 281 U.S. 700, 74 L. Ed. 1126 (1930)). " 'There is no contract between the State and the public that a municipal charter shall not at all times be subject to

the direction and control of the body by which it is granted.' " *Id.*; *see also Williamson v. City of High Point*, 213 N.C. 96, 106, 195 S.E. 90, 96 (1938) ("[Municipalities] are but instrumentalities of the State for the administration of local government, and their authority as such may be enlarged, abridged, or withdrawn entirely at the will or pleasure of the Legislature.") (internal quotation marks omitted). Our Supreme Court has further stated that

> a municipal corporation has no extra-territorial powers; but the rule is not without exceptions. The Legislature has undoubted authority to confer upon cities and towns jurisdiction for sanitary and police purposes in territory contiguous to the corporation. . . . If a municipality owns and operates a water or lighting plant and has an excess of water or electricity beyond the requirements of the public, which is available for disposal, it may make a sale of such excess to outside consumers as an incident to the proper exercise of its legitimate powers. . . . It is equally clear that without legislative authority [a municipality] would not be permitted to extend its lines beyond the corporate limits for the purpose of selling [water] to nonresidents of the city.

*Williamson*, 213 N.C. at 106, 195 S.E. at 96 (omissions in original) (internal quotation marks omitted). Thus, "in common with all the courts of this country, .... municipal corporations, *in the absence of constitutional restrictions*, are the creatures of the legislative will, and are subject to its control; the sole object being the common good, and that rests in legislative discretion." *Town of Highlands v. City of Hickory*, 202 N.C. 167, 168, 162 S.E. 471, 471 (1932) (emphasis added) (internal quotation marks omitted).

"All power which is not expressly limited by the people in our State Constitution remains with the people, and an act of the people through their representatives in the legislature is valid unless prohibited by that Constitution." *State ex rel. Martin v. Preston*, 325 N.C. 438, 448-49, 385 S.E.2d 473, 478 (1989). "The members of the General Assembly are representatives of the people. The wisdom and expediency of a statute are for the legislative department, when acting entirely within constitutional limits." *McIntyre v. Clarkson*, 254 N.C. 510, 515, 119 S.E.2d 888, 891 (1961). Nonetheless, "we are aware that . . . '[i]t is well settled in this State that the courts have the power, and it is their duty in proper cases, to declare an act of the General Assembly unconstitutional—but it must be plainly and clearly the case.' " *Williams v. Blue Cross Blue Shield of N.C.*, 357 N.C. 170, 183,

581 S.E.2d 415, 425 (2003) (quoting *Glenn v. Bd. of Educ.*, 210 N.C. 525, 529-30, 187 S.E. 781, 784 (1936)). " 'If there is any reasonable doubt, it will be resolved in favor of the lawful exercise of their powers by the representatives of the people.' " *Id.*

Article II, Section 24 of the North Carolina Constitution identifies fourteen "[p]rohibited subjects" about which the General Assembly "shall not enact any local, private, or special act or resolution." N.C. Const. art. II, § 24, cl. 1. "Any local, private, or special act or resolution enacted in violation of the . . . [limitations specified in Section 24] shall be void." N.C. Const. art. II, § 24, cl. 3. The purpose for this provision in our Constitution was most recently chronicled by our Supreme Court in *Williams v. Blue Cross Blue Shield of North Carolina*, 357 N.C. 170, 581 S.E.2d 415 (2003):

> The organic law of the State was originally drafted and promulgated by a convention which met at Halifax in December[] 1776. During the ensuing 140 years, the Legislature of North Carolina possessed virtually unlimited constitutional power to enact local, private, and special statutes. This legislative power was exercised with much liberality, and produced a plethora of local, private, and special enactments. As an inevitable consequence, the law of the State was frequently one thing in one locality, and quite different things in other localities. To minimize the resultant confusion, the people of North Carolina amended their Constitution at the general election of 1916 so as to deprive their Legislature of the power to enact local, private, or special acts or resolutions relating to many of the most common subjects of legislation.
>
> . . . .
>
> In thus amending their organic law, the people were motivated by the desire that the General Assembly should legislate for North Carolina in respect to the subjects specified as a single united commonwealth rather than as a conglomeration of innumerable discordant communities. To prevent this laudable desire from degenerating into a mere pious hope, they decreed in emphatic and express terms that "any local, private, or special act or resolution passed in violation of the provisions of this section shall be void."

*Id.* at 185-86, 581 S.E.2d at 426-27 (omission in original) (quoting *Idol v. Street*, 233 N.C. 730, 732-33, 65 S.E.2d 313, 314-15 (1951)). Thus, the Court determined,

[i]t was the purpose of [Article II, Section 24] to free the General Assembly from the enormous amount of petty detail which had been occupying its attention, to enable it to devote more time and attention to general legislation of statewide interest and concern, to strengthen local self-government by providing for the delegation of local matters by *general laws* to local authorities, and to require uniform and coordinated action under general laws on matters related to the welfare of the whole State.

*Id.* at 188, 581 S.E.2d at 428 (alteration in original) (quoting *High Point Surplus Co. v. Pleasants*, 264 N.C. 650, 656, 142 S.E.2d 697, 702 (1965)). The issue in the present case turns on whether the Constitution otherwise prohibited the enactment of Sullivan II or III by virtue of Article II, Section 24. *See City of New Bern v. New Bern-Craven County Bd. of Educ.*, 338 N.C. 430, 438, 450 S.E.2d 735, 740 (1994). "If so, the legislature's ability to ascribe [or deny] powers and duties to [Asheville] does not extend to [the Sullivan Acts] and they are void." *See id.*

Our review of this issue is two-fold. *See Williams*, 357 N.C. at 183, 581 S.E.2d at 425. First, we must determine whether the Sullivan Acts are local acts as contended by Asheville or whether they are general laws as contended by defendants. *See id.* Second, if they are found to be local acts, we must determine whether the Sullivan Acts (1) relate to health and sanitation or (2) regulate trade. *See id.*

A.

To consider whether Sullivan II and III are violative of Subclauses (a) or (j) of Article II, Section 24, Clause 1 of our Constitution, we must first determine whether Sullivan II and III are local acts or general laws. A determination that Sullivan II and III are general laws would render further consideration of this issue unnecessary because (1) our Supreme Court has long held that " '[a] statute is either 'general' or 'local'; there is no middle ground,' " *id.* (quoting *High Point Surplus Co.*, 264 N.C. at 656, 142 S.E.2d at 702), and (2) Clause 1 of Section 24 is implicated only after a law is determined to be "local," "private," or "special." *See* N.C. Const. art. II, § 24, cl. 1.

The General Assembly may be "directed or authorized by th[e] Constitution to enact general laws," and those "[g]eneral laws may be enacted for classes defined by population *or other criteria*." N.C. Const. art. XIV, § 3 (emphasis added). A law is general where it

*is broad enough* to reach . . . all places affected by the conditions to be remedied, *so that the statute operates uniformly through-out the state under like circumstances,* and its classification is reasonable and based upon a rational difference of situation or condition, . . . *even though it does not actually apply to all parts of the state, or indeed, even though there are only a few places, or one place, on which the statute operates.*

*McIntyre,* 254 N.C. at 518, 119 S.E.2d at 894 (emphasis added). Thus, "[c]onceivably, a statute may be local if it excludes only one county. On the other hand, it may be general if it includes only one or a few counties. It is a matter of classification." *High Point Surplus Co.,* 264 N.C. at 656, 142 S.E.2d at 702.

Conversely, as discussed above, Article II, Section 24 of the North Carolina Constitution expressly provides that the General Assembly "shall not enact any local, private, or special act or resolution" relating to or regulating any of fourteen enumerated subjects. *See* N.C. Const. art. II, § 24, cl. 1. Our Supreme Court has stated that, within the meaning of constitutional prohibitions against local laws, a law is local where,

by force of an inherent limitation, it arbitrarily separates some places from others upon which, but for such limitation, it would operate, *where it embraces less than the entire class of places to which such legislation would be necessary or appropriate having regard to the purpose for which the legislation was designed,* and where the classification does not rest on circumstances distinguishing the places included from those excluded.

*Williams,* 357 N.C. at 184, 581 S.E.2d at 425-26 (emphasis added) (quoting *McIntyre,* 254 N.C. at 518, 119 S.E.2d at 894). Accordingly, "when the persons or things subject to the law are not reasonably different from those excluded, the statute is local or special." *McIntyre,* 254 N.C. at 518, 119 S.E.2d at 894. In other words, a local law "discriminates between different localities without any real, proper, or reasonable basis or necessity—a necessity springing from manifest peculiarities clearly distinguishing those of one class from each of the other classes, and imperatively demanding legislation for each class separately that would be useless or detrimental to the others." *Id.* "[U]ltimately the problem is resolved into the question of what facts in each case are sufficiently important to justify the exclusions and inclusions." *Id.* at 519, 119 S.E.2d at 894 (alteration in original) (internal quotation marks omitted).

Because " 'no exact rule or formula capable of constant application can be devised for determining in every case whether a law is local, private or special or whether general,' " *Williams*, 357 N.C. at 183, 581 S.E.2d at 425 (quoting *McIntyre*, 254 N.C. at 517, 119 S.E.2d at 893), the Court has "set out alternative methods for determining whether a law is general or local." *Id.* (citing *City of New Bern*, 338 N.C. at 435-36, 450 S.E.2d at 738-39).

The "reasonable classification" method of analysis, first applied in *McIntyre v. Clarkson*, 254 N.C. 510, 119 S.E.2d 888 (1961), "considers how the law in question classifies the persons or places to which it applies." *Williams*, 357 N.C. at 183, 581 S.E.2d at 425. Under this analysis, "[a] law is general if it applies to and operates uniformly on all the members of any class of persons, places or things requiring legislation peculiar to itself in matters covered by the law." *McIntyre*, 254 N.C. at 519, 119 S.E.2d at 894 (internal quotation marks omitted). "Classification must be reasonable and germane to the law. It must be based on a reasonable and tangible distinction and operate the same on all parts of the state under the same conditions and circumstances. Classification must not be discriminatory, arbitrary or capricious." *Id.* at 519, 119 S.E.2d at 894-95. "The Legislature has *wide discretion* in making classifications." *Id.* at 519, 119 S.E.2d at 894 (emphasis added). Accordingly, "[t]he test is whether the classification is reasonable and whether it embraces all of the class to which it relates. Classifications . . . must be natural and intrinsic and based on substantial differences." *Id.* at 519, 119 S.E.2d at 894-95; *see also City of New Bern*, 338 N.C. at 435-36, 450 S.E.2d at 738-39 ("[Under this test, a law is general if] any rational basis reasonably related to the objective of the legislation can be identified which justifies the separation of units of local government into included and excluded categories.") (internal quotation marks omitted) (quoting *Adams v. N.C. Dep't. of Nat. & Econ. Res.*, 295 N.C. 683, 691, 249 S.E.2d 402, 407 (1978)).

In *Town of Emerald Isle v. State of North Carolina*, 320 N.C. 640, 360 S.E.2d 756 (1987), the Supreme Court departed from the "reasonable classification" test and instead "applied a general public interest method of analysis, which focuses on 'the extent to which the act in question affects the general public interests and concerns.' " *City of New Bern*, 338 N.C. at 436, 450 S.E.2d at 739 (quoting *Emerald Isle*, 320 N.C. at 651, 360 S.E.2d at 763). In *Emerald Isle*, the Court "addressed whether an act that established a public pedestrian beach access facility in Bogue Point was a local act." *Id.* There, "the act in

question applied only to a site-specific portion of land on a particular . . . public pedestrian beach access facility [which, by definition,] . . . rest[ed] in but one location." *Williams*, 357 N.C. at 184, 581 S.E.2d at 426 (internal quotation marks omitted). The Court held that the purpose of the act in *Emerald Isle* was "to establish pedestrian beach access facilities for general public use in the vicinity of Boglet Inlet," and so held that the act was *not* a local act, reasoning that, "[b]y directing the establishment of public pedestrian beach access facilities including parking areas, pedestrian walkways, and restroom facilities, the legislature . . . sought to promote the general public welfare by preserving the beach area for general public pedestrian use." *Emerald Isle*, 320 N.C. at 651-52, 360 S.E.2d at 763.

In the present case, we do not believe that the method of classification identified in *Emerald Isle* is an appropriate test to analyze whether Sullivan II and III are general laws or local acts. First, Sullivan II and III are "not site-specific as in *Emerald Isle* because '[s]uch . . . legislated change[s] could be effected as easily in [Buncombe County] as in any other [county] in the state.' " *See Williams*, 357 N.C. at 184-85, 581 S.E.2d at 426 (first and fourth alterations in original) (quoting *City of New Bern*, 338 N.C. at 436, 450 S.E.2d at 739). Additionally, while any member of the general public who travels to Bogue Point could benefit from the pedestrian beach access facilities at issue in *Emerald Isle*, Sullivan II and III expressly benefit only a small subset of North Carolinians. Specifically, Sullivan II applies only to those "water consumer[s] in Buncombe County currently or hereafter connected to the waterlines currently maintained by the Asheville/Buncombe Water Authority" against whom the City of Asheville would seek "to charge, exact, or collect . . . a rate for water consumed higher than the rate charged for the same classification of water consumer[s] residing or located within the corporate limits of the City of Asheville." Sullivan II, ch. 140, 2005 N.C. Sess. Laws 246. Sullivan III applies only to citizens of Asheville and citizens of other areas located outside the corporate limits of the city to whom Asheville furnishes its public enterprise services. *See* Sullivan III, ch. 139, 2005 N.C. Sess. Laws 243. Consequently, the general public interest method of analysis identified in *Emerald Isle* is inapplicable to this case. *See Williams*, 357 N.C. at 185, 581 S.E.2d at 426.

To determine whether the General Assembly was authorized by the Constitution to enact Sullivan II and to prohibit Asheville from charging higher rates to water consumers for services provided outside its corporate limits, we must examine whether Sullivan II was

"rationally based upon some situation unique to" Buncombe County to warrant the Legislature's decision to revoke from Asheville the authority it otherwise conferred to all cities in the State to charge differential rates to public enterprise service consumers under N.C.G.S. §§ 160A-311, -312, and -314. *See Williams*, 357 N.C. at 185, 581 S.E.2d at 426. With regard to Sullivan III, we must determine whether the Legislature's decision was warranted to modify N.C.G.S. § 160A-312 as follows: (1) to allow Asheville, unlike any other city in the State subject to N.C.G.S. § 160A-312, to be held liable for damages to those citizens outside the corporate limits for failure to furnish any public enterprise service; and (2) to restrict Asheville's discretionary management of revenue from its water distribution system, unlike any other city in the State, by requiring the city to "account for a public enterprise in a separate fund and . . . not transfer any money from that fund to another except for a capital project fund established for the construction or replacement of assets for that public enterprise." Sullivan III, ch. 139, 2005 N.C. Sess. Laws 243-44.

In 1971, the General Assembly conferred upon all cities in North Carolina the power to "establish, . . . maintain, own, [and] operate" those endeavors defined as "public enterprises," which included "[w]ater supply and distribution systems." N.C. Gen. Stat. §§ 160A-311(2), 160A-312(a) (2007). At the same time, the General Assembly empowered cities to "establish and revise from time to time schedules of rents, rates, fees, charges, and penalties for the use of or the services furnished by any public enterprise." N.C. Gen. Stat. § 160A-314(a) (2007). The Legislature also conferred upon all North Carolina cities the power to "vary [those schedules of rents, rates, fees, charges, and penalties] according to classes of service, and [to adopt] *different schedules* [of rents, rates, fees, charges, and penalties] . . . *for services provided outside the corporate limits of the city.*" *Id.* (emphasis added). In other words, according to this Court's interpretation of N.C.G.S. § 160A-314(a) in *Town of Spring Hope v. Bissette*, 53 N.C. App. 210, 280 S.E.2d 490 (1981), *aff'd*, 305 N.C. 248, 287 S.E.2d 851 (1982), "[u]nder this broad, unfettered grant of authority, the setting of . . . rates and charges [for water and sewer services] is a matter for the judgment and discretion of municipal authorities, not to be invalidated by the courts *absent some showing of arbitrary or discriminatory action.*" *Smith Chapel Baptist Church v. City of Durham*, 350 N.C. 805, 816, 517 S.E.2d 874, 881 (1999) (first alteration in original) (emphasis added) (internal quotation marks omitted). Finally, also in 1971, the version of N.C.G.S. § 160A-312 enacted by

the General Assembly and made generally applicable to all municipalities prior to the modifications of Sullivan III specified that, while a city may "acquire, construct, establish, enlarge, improve, maintain, own, and operate any public enterprise outside its corporate limits, within reasonable limitations, . . . in no case shall a city be held liable for damages to those outside the corporate limits for failure to furnish any public enterprise service." N.C. Gen. Stat. § 160A-312(a).

Thus, while the Constitution does not forbid the General Assembly from "conferring upon municipal corporations additional powers *or restricting the powers theretofore vested in them*" by the Legislature, *see Holton*, 189 N.C. at 149, 126 S.E. at 328 (emphasis added), the issue before us is whether the General Assembly's decision to enact Sullivan II and III was based on circumstances that made the water distribution system in Asheville reasonably different from all other North Carolina municipalities which were excluded from Sullivan II and III.

According to three of the eighteen legislative findings included in its preamble, the General Assembly enacted Sullivan II expressly because

> practically all, if not all, of the cost of the waterlines serving Buncombe County (outside of the corporate limits of the City of Asheville) has been paid by the County of Buncombe, the various water and sewer districts of the County of Buncombe, by the Asheville/Buncombe Water Authority pursuant to its duties to Buncombe County, and by private developers and landowners, desiring water service in such areas and not paid by the City of Asheville; and

> . . . during the term of the Water Agreement, the County of Buncombe has paid directly to the City of Asheville in excess of $37,000,000 pursuant to that Agreement; and

> . . . .

> . . . the complicated pattern of dealings between the City of Asheville and the County of Buncombe regarding the provision of water to water consumers in Buncombe County connected to the waterlines currently maintained by the Asheville/Buncombe Water Authority, and replacements, extensions, and additions thereto has now given rise to the issue of the rate that the City of Asheville may charge the water consumers in Buncombe County connected to the waterlines currently maintained by the

Asheville/Buncombe Water Authority, and replacements, extensions, and additions thereto to whom it provides water even though [Sullivan I] remains in full force and effect . . . .

Sullivan II, ch. 140, 2005 N.C. Sess. Laws 245-46. Defendants argue that (1) these findings are "the reasons why the past, current, and anticipated future equities necessitated the enactment of [Sullivan II and III]," (2) the "long and tumultuous history" involving Asheville's water distribution system "amply justifies" the legislative action contained in Sullivan II and III, and (3) Asheville has failed to show any other public water utility in North Carolina with a history "even remotely as complex, long-standing, and unique" as Asheville's.

As mentioned above, *Candler* chronicled the first thirty-five years of the history of this case and made the following findings:

It is clear, under the facts disclosed on this record, that every purchaser of water in these water or water and sewer districts, from the City of Asheville, at the rates fixed for consumers of water within the city limits of Asheville, are paying as much of the debt service and interest, as well as the cost of operating, repairing, and maintaining the water and sewer systems of the City of Asheville, as any resident of the City who purchases a like amount of water. Moreover, in addition thereto, the persons, firms, and corporations in these water or water and sewer districts are being taxed to pay the debt service, including interest on bonds issued to construct the water or water and sewer system in these respective districts, as well as taxing themselves for the repair and maintenance of such water or water and sewer system. Asheville contributed nothing to the construction of these systems, neither does it contribute anything to the cost of repairing and maintaining them. Asheville renders no service except to pump the water into the water systems, read the meters, which it did not furnish and does not service, and to bill the consumers.

It further appears from the record that a little over twenty-eight per cent of the meters through which the City of Asheville furnishes water are outside its corporate limits and the City derives a little over twenty-seven per cent of its total income from its water system from these outside consumers.

*Candler*, 247 N.C. at 410-11, 101 S.E.2d at 479. Since no party in the present case attempts to dispute the factual findings in *Candler* that chronicle the history of the water distribution system through

1958, we turn our attention to the history of the water system following *Candler*.

As discussed above, in 1960, Asheville annexed portions of the territory of the original water districts that were the subject of *Candler* and assumed $396,000.00 in bonded indebtedness as a pro-rata share of the existing principal balance from the water districts for areas annexed into Asheville that year. This bonded indebtedness was paid off in full in 1976.

In *Candler*, the parties stipulated that, of the total 20,977 water meters in operation for the water distribution system both inside and outside the corporate limits for the fiscal year ending 30 June 1956, 5,983 or 28.5% of the water meters were located in the water districts outside Asheville's corporate limits. *See id.* at 402, 101 S.E.2d at 473. Additionally, of the $1,056,703.00 generated in revenue from the sale of water through all water system meters, $285,483.00 or 27% of that revenue was generated from the sale of water to consumers located outside Asheville's city limits. *See id.* at 402-03, 101 S.E.2d at 473. Fifty years later, for the fiscal year ending 30 May 2006, of Asheville's 49,615 water system meters in operation, 28,044 accounts were inside its city limits while 21,571 or 43.5% were outside its city limits, the majority of which are in unincorporated areas of Buncombe County. And, of the $19,794,697.16 generated in revenue from the sale of water to all consumers, $8,477,640.07 or 42.8% was generated from the meters of consumers located outside Asheville's corporate limits.

An audit was conducted of the City of Asheville and the Asheville/Buncombe Water System for the fiscal years 1957 through 2005. According to the affidavit of certified public accountant Towson who supervised that audit, for the time period following *Candler*, Asheville reported a "total operating revenue for the water system of $447,142,263.00. Operating revenues are those funds received from the operation of the water system, primarily from the sale of water." For the same period of time, Asheville's reported net operating revenue for the water system, i.e., the operating revenues for the water system minus the system and "other" expenditures, totaled $113,929,113.00. Those "other" expenditures for the water system included categorizations by Asheville for "Administrative—reimburse general and other funds" ($52,473,739.00), "Department wide expenditures" ($39,324,144.00), and "Tax and franchise benefits paid to general fund" ($12,372,231.00). In sum, according to the record, practically all of the cost of the waterlines serving Buncombe County

outside Asheville's corporate limits has been paid by Buncombe County, by its various water and sewer districts, by the Asheville/Buncombe Water Authority pursuant to its duties to Buncombe County, and by private developers and landowners, desiring water service in such areas and not paid by Asheville. Further, according to his sworn deposition, Asheville's Director of the Water Resources Department Hanks was "not aware" of "any lines outside [Asheville's] city limits that the installation of which was paid for by [Asheville, exclusive of grant money]."

Asheville identifies five pairings of municipalities and counties to support its contention that other municipalities "currently operating municipally-owned water systems now receive or have historically received sizeable contributions toward the construction, maintenance, and operation of such systems from the counties in which the cities are located." Those pairings include Macon County and both the Town of Highlands and the Town of Franklin, Durham County and the City of Durham, Forsyth County and the City of Winston-Salem, and Cabarrus County and the City of Concord. According to Asheville, none of these municipalities are subject to the same restrictions as those embodied in Sullivan II and III. Asheville asserts that, while the examples are not the result of an exhaustive search, they simply "confirm Asheville's denial that there is anything unique about Buncombe County's participation in financing the construction and/or operation of the water system which is now owned by [Asheville]." Further supporting Asheville's contention is a study done for fiscal year 2005-06 by the North Carolina League of Municipalities in cooperation with the University of North Carolina Environmental Finance Center which suggests that most municipalities in North Carolina charge both residential and commercial water utility consumers located outside a city's limits rates higher than those charged to the same class of consumers located inside a city's limits. However, these data do not include the rationales for the rate differentials between inside and outside consumers within each municipality, nor do they report the financial histories of the construction of the water systems, stating only: "Compare with caution. High rates may be justified and necessary to protect public health."

While we find ample support in the record to justify the Legislature's findings that Asheville and Buncombe County have experienced a "complicated pattern of dealings" with respect to the development and maintenance of its water distribution system, *see* Sullivan II, ch. 140, 2005 N.C. Sess. Laws 246, it is not clear from the

record that this history is one of "manifest peculiarities clearly distinguishing" Asheville and Buncombe County from other municipalities and counties across the State. *See McIntyre*, 254 N.C. at 518, 119 S.E.2d at 894. Again, in order for Sullivan II and III to be classified as general laws, they must have been enacted based on circumstances that make the water distribution system in Asheville reasonably different from those municipalities and counties excluded from Sullivan II and III such that there is "a logical basis" for treating Asheville in a different manner. *See High Point Surplus Co.*, 264 N.C. at 656, 142 S.E.2d at 702.

We recognize that " '[t]here is no constitutional requirement that a regulation, in other respects permissible, must reach every class to which it might be applied—that the Legislature must be held rigidly to the choice of regulating all or none.' " *Adams*, 295 N.C. at 693, 249 S.E.2d at 408 (quoting *Silver v. Silver*, 280 U.S. 117, 74 L. Ed. 221 (1929)). " 'It is enough that . . . [a] statute strikes at the evil where it is felt, and reaches the class of cases where it most frequently occurs.' " *Id.* However, we are not persuaded that the history of the development of the water distribution system in Asheville is necessarily where "the evil" has exclusively and "most frequently occur[red]." *See id.* Therefore, it appears that Sullivan II and III may "embrace[] less than the entire class of places to which such legislation would be necessary or appropriate having regard to the purpose for which the legislation was designed." *See Williams*, 357 N.C. at 184, 581 S.E.2d at 426 (quoting *McIntyre*, 254 N.C. at 518, 119 S.E.2d at 894). Accordingly, we hold that Sullivan II and III are local acts.

### B.

#### 1. Relating to health and sanitation

[6] Since "an act is not constitutionally invalid merely because it is local," we must now determine whether Sullivan II and III violate Article II, Section 24 of the North Carolina Constitution. *See Cheape v. Town of Chapel Hill*, 320 N.C. 549, 558, 359 S.E.2d 792, 797 (1987). Asheville contends Sullivan II and III relate to health and sanitation, and are thus violative of Article II, Section 24(1)(a) because the Supreme Court has specifically held that local acts which prescribe provisions regarding sewer and water service necessarily relate to health and sanitation and because "it is absolutely plain from the text" that the subject of Sullivan II and III is Asheville's water system. We disagree.

Constitutional Subclause (a) of Article II, Section 24, Clause 1 provides that "[t]he General Assembly shall not enact any local, private, or special act or resolution . . . [r]elating to health, sanitation, and the abatement of nuisances." N.C. Const. art. II, § 24, cl. 1(a). However, the use of the nonspecific phrase "[r]elating to" suggests that even the mere mention of a subject which connotes any relationship to health or sanitation—no matter how tenuous—might constitute an act *relating to* health and sanitation and, thus, be violative of this constitutional provision. Nevertheless, a thorough review of earlier cases that examine whether specific legislative enactments *relate to* health or sanitation reveals that, in order for a court to determine that a legislative enactment *relates to* health or sanitation, the court must conclude that an act either plainly "state[s] that *its purpose is to regulate* sanitary matters, or to regulate health[, or must conclude that the purpose of the act is to regulate health or sanitary matters after a] . . . careful perusal of the entire act, . . . [wherein] *the entire act must be considered.*" *Reed v. Howerton Eng'g Co.*, 188 N.C. 39, 44, 123 S.E. 479, 481 (1924) (emphasis added). Further, "[a]lthough the legislative findings and declaration of policy have no magical quality to make valid that which is invalid, and are subject to judicial review, they are entitled to weight in construing the statute and in determining whether the statute promotes a public purpose or use under the Constitution." *Redev. Comm'n. of Greensboro v. Sec. Nat'l Bank*, 252 N.C. 595, 611, 114 S.E.2d 688, 700 (1960).

In support of its contention that Sullivan II and III relate to health and sanitation, Asheville cites *Lamb v. Board of Education*, 235 N.C. 377, 70 S.E.2d 201 (1952), *Gaskill v. Costlow*, 270 N.C. 686, 155 S.E.2d 148 (1967), *City of New Bern v. New Bern-Craven County Board of Education*, 338 N.C. 430, 450 S.E.2d 735 (1994), and *Idol v. Street*, 233 N.C. 730, 65 S.E.2d 313 (1951).

In *Lamb*, where an act "impose[d] the duty upon the County Board of Education to make provision for 'a good supply of wholesome water,' " the Court concluded it related to health and sanitation because "its sole purpose [wa]s to prescribe provisions with respect to sewer and water service for local school children in Randolph County [since it] purport[ed] to limit the power of the County Board of Education to provide for sanitation and *healthful conditions* in the schools by means of a sewerage system and an *adequate water supply.*" *Lamb*, 235 N.C. at 379, 70 S.E.2d at 203 (emphasis added).

In *Gaskill*, the Court concluded that an act was related to health and sanitation because, on its face, it provided that a municipality

"shall not be required to extend any sewerage outfalls into the area to be annexed" "in the event the sewerage system of the municipality shall have been *declared to be unfit, obsolete, or a source of unlawful pollution* to adjacent streams or waterways by the State Stream Sanitation Committee." *Gaskill*, 270 N.C. at 687, 155 S.E.2d at 149 (emphasis added).

In *City of New Bern*, the Court held that the acts which "shift[ed] the responsibility for enforcing the building code from the City to the county" were "inescapabl[y]" related to health and sanitation because "both the legislature's directions for the creation of the Code and the Building Code Council's stated purposes for the different inspections under the Code evince[d] an intent to protect the health of the general public." *City of New Bern*, 338 N.C. at 436, 440, 450 S.E.2d at 739, 741. The Court reasoned that "[t]he Code regulates plumbing in an effort to maintain sanitary conditions in the buildings and structures of this state and thus directly involves sanitation, and consequently the protection of the health of those who use the buildings[, while t]he enforcement of the fire regulations protects lives from fire, explosion and health hazards." *Id.* at 440, 450 S.E.2d at 741.

Finally, in *Idol*, the General Assembly enacted a local act which consolidated the public health agencies and departments of Forsyth County and the City of Winston-Salem, established a joint city-county board of health "for regulating the public health interests of Winston-Salem and Forsyth County," and appointed a joint city-county health officer "for administering public health laws and regulations in Winston-Salem and Forsyth County." *Idol*, 233 N.C. at 733, 65 S.E.2d at 315. The Court held that it was "clear beyond peradventure" that the act related to health. *Id.*

Asheville also cites *Pulliam v. City of Greensboro*, 103 N.C. App. 748, 407 S.E.2d 567, *disc. review denied*, 330 N.C. 197, 412 S.E.2d 59 (1991), to assert that Sullivan II and III relate to health and sanitation because "[w]ater is not only vital to our good health but 'vital to clean living.' " The logical conclusion of Asheville's assertion suggests that *Pulliam* supports the proposition that a legislative enactment's mere reference to or invocation of water or a water system necessitates a conclusion that an act *relates to* health or sanitation. However, the full excerpt from *Pulliam* does not compel such a broad interpretation:

While we recognize the public's vital interest in dependable sanitary sewer service in municipal areas and that people living in

cities and towns expect to have such service, it may be said that in today's society, electric service is also vital and that almost no one tries to live without its benefits. *We also note with interest that those customers who don't pay their water* and sewer *bills are doomed to deprivation of that service however vital to clean living that service may be.*

*Pulliam*, 103 N.C. App. at 754, 407 S.E.2d at 570 (emphasis added). Thus, while *Pulliam* acknowledges that water is "vital to clean living," it also recognizes that a municipality may deny water service to consumers for *purely economic reasons*, even though those consumers may then be "doomed to deprivation" of such a "vital" service. *See id.*

As excerpted in section II(A) above, the legislative findings in the preamble for Sullivan II provide:

[T]he citizens of Buncombe County outside the corporate limits of the City of Asheville now, or in the future to be, supplied water from lines connected to the waterlines currently maintained by the Asheville/Buncombe Water Authority, and replacements, extensions, and additions thereto, *are entitled to obtain water at a fair rate from the water system for which they have paid*, through taxes, through payments for water, and through direct payments by the County of Buncombe and its water and sewer districts; and

. . . .

. . . the Asheville/Buncombe Water Authority has developed substantial excess capacity in anticipation of the growth of population in Buncombe County and of supplying water to the additional population from facilities the cost of which has been, and in the future will be, paid out of water system revenues; and

. . . .

. . . the complicated pattern of dealings between the City of Asheville and the County of Buncombe regarding the provision of water to water consumers in Buncombe County connected to the waterlines currently maintained by the Asheville/Buncombe Water Authority, and replacements, extensions, and additions thereto has now given rise to the issue of the rate that the City of Asheville may charge the water consumers in Buncombe County connected to the waterlines currently maintained by the

Asheville/Buncombe Water Authority, and replacements, extensions, and additions thereto to whom it provides water even though the Sullivan Act remains in full force and effect . . . .

Sullivan II, ch. 140, 2005 N.C. Sess. Laws 245-46 (emphasis added). Section 1 of Sullivan II provides that "*it shall be unlawful* for the City of Asheville . . . *to charge,* exact, or collect from any water consumer in Buncombe County . . . *a rate for water consumed higher than the rate charged* for the same classification of water consumer residing or located within the corporate limits of the City of Asheville." Sullivan II, ch. 140, 2005 N.C. Sess. Laws 246 (emphasis added). Section 2 provides that Asheville "*may . . . cause any user of water who shall fail to pay promptly his water rent for any month to be cut off* and his right to further use of water from the city system to be discontinued until payment of any water rent arrearages." *Id.* (emphasis added). And section 3 of Sullivan II provides that "the Board of Commissioners of *Buncombe County . . . [shall] maintain the waterlines* owned by the County of Buncombe and such water districts in proper repair *in order that there may not be a waste of water by leakage.*" Sullivan II, ch. 140, 2005 N.C. Sess. Laws 247 (emphasis added).

Thus, while we agree with Asheville that it is "absolutely plain from the text" that the subject of Sullivan II is Asheville's water distribution system, based on the express language of its preamble and enabling provisions, we conclude that Sullivan II relates only to matters which are purely economic in nature. While section 1 directly addresses the economic issue of equitable rates, we think that section 2 most strongly belies Asheville's contention, since section 2 provides that a water consumer who fails to promptly pay his or her water bill can and will be "cut off" from the water supply until all arrearages are fully paid. *See* Sullivan II, ch. 140, 2005 N.C. Sess. Laws 246. If the purpose of this enactment was "relat[ed] to health and sanitation" as interpreted by the Constitution, would it not be antithetical to that purpose to allow Asheville to deprive any of its citizens access to that which is so "vital to clean living"? *See Pulliam,* 103 N.C. App. at 754, 407 S.E.2d at 570. Further, while one could interpret section 3's mandate to "maintain the waterlines" as relating to the health and sanitation of the water system and its users, the enabling language expressly states that its purpose to maintain the lines is "in order that there may not be *a waste of water by leakage.*" Sullivan II, ch. 140, 2005 N.C. Sess. Laws 247. Again, we find that this language principally contemplates preventing the economic impact of wastefulness on the

water distribution system, rather than prioritizing the system's health or sanitary conditions. Therefore, we hold that Sullivan II does not relate to health or sanitation and, thus, does not violate Article II, Section 24(1)(a) of the North Carolina Constitution.

With respect to Sullivan III, while its language implicates modifications to N.C.G.S. § 160A-312 that apply to "any public enterprise" in the City of Asheville, Asheville's City Manager Jackson stated that, at the time Sullivan III was enacted, Asheville had operated only three of the ten types of public enterprises it was authorized to operate under N.C.G.S. § 160A-311: a water supply and distribution system, a public transportation system, and several off-street parking facilities. *See* N.C. Gen. Stat. § 160A-311(2), (5), and (8). Accordingly, since Sullivan III "applies only to the City of Asheville[, and] . . . shall not apply to the operation of public transportation systems or off-street parking facilities and systems as public enterprises," Sullivan III, ch. 139, 2005 N.C. Sess. Laws 244, we agree with Asheville that the limitations of Sullivan III apply solely to Asheville's management of, and responsibility for, the operation of the water distribution system. Nevertheless, as we discussed above, the mere implication of water or a water system in a legislative enactment does not necessitate a conclusion that it relates to health and sanitation in violation of the Constitution.

"The best indicia of . . . legislative purpose are 'the language of the statute, the spirit of the act, and what the act seeks to accomplish.' " *State ex rel. Comm'r of Ins. v. N.C. Rate Bureau,* 300 N.C. 381, 399, 269 S.E.2d 547, 561 (quoting *Stevenson v. City of Durham,* 281 N.C. 300, 303, 188 S.E.2d 281, 283 (1972)), *reh'g denied,* 301 N.C. 107, 273 S.E.2d 300 (1980). "In addition, a court may consider 'circumstances surrounding [the statute's] adoption which throw light upon the evil sought to be remedied.' " *Id.* (alteration in original) (quoting *State ex rel. N.C. Milk Comm'n v. Nat'l Food Stores, Inc.,* 270 N.C. 323, 332, 154 S.E.2d 548, 555 (1967)).

Although the first three editions of the act included a preamble of legislative findings mirroring those in Sullivan II, Sullivan III as ratified does not include a preamble. Thus, we will examine the plain language of Sullivan III to determine whether its express or implied purpose relates to health or sanitation.

By its terms, in addition to deleting the provision that would otherwise prohibit Asheville from being held liable for damages to those outside the corporate limits for failure to furnish any services from

the water distribution system, Sullivan III provides that Asheville "shall account for . . . [the water distribution system] in a separate fund and may not transfer any money from that fund to another except for a capital project fund established for the construction or replacement of assets for [the water distribution system]." Sullivan III, ch. 139, 2005 N.C. Sess. Laws 244. In contrast to our review of Sullivan II's provision which mandated the maintenance of the water-lines "in order that there may not be a waste of water by leakage," Sullivan II, ch. 140, 2005 N.C. Sess. Laws 247, Sullivan III identifies no such purpose tying this provision to the "evil" of economic wasteful-ness. In our opinion, without such an expression or any other to explain its purpose, a plain reading of this provision establishing a capital project fund "for the construction or replacement of assets" for the water distribution system could be interpreted to indicate the Legislature's intent simply to concern the growth and maintenance of a fully-functioning water distribution system in Asheville. *See* Sullivan III, ch. 139, 2005 N.C. Sess. Laws 244. According to this inter-pretation, the creation of such a fund restricting the use of revenue to the limited purposes of growing and maintaining the water system could "provide for . . . healthful conditions in the [community] by means of . . . an adequate water supply," *see Lamb*, 235 N.C. at 379, 70 S.E.2d at 203, and could likely prevent Asheville's water distribution system from becoming "declared to be unfit [or] obsolete." *See Gaskill*, 270 N.C. at 687, 155 S.E.2d at 149. Further, the evidence shows that during the period from October 1981 through June 2005, the water system had "been allowed to fall farther into disrepair" while Asheville and Buncombe County were "taking money from the water system," a condition which might be corrected with the cre-ation of a fund dedicated to supporting the growth and maintenance of the water distribution system.

However, as we stated above, "we are aware that . . . '[i]t is well settled in this State that the courts have the power, and it is their duty in proper cases, to declare an act of the General Assembly unconsti-tutional—but it must be plainly and clearly the case' "; " '[i]f there is any reasonable doubt, it will be resolved in favor of the lawful exer-cise of their powers by the representatives of the people.' " *Williams*, 357 N.C. at 183, 581 S.E.2d at 425 (quoting *Glenn*, 210 N.C. at 529-30, 187 S.E. at 784). Thus, since Sullivan III was enacted on the same day as Sullivan II and contained the same legislative findings as Sullivan II in its three earlier editions before it was ratified, we cannot be cer-tain that the legislative purpose of Sullivan III is inconsistent with

that of Sullivan II. Since any reasonable doubt must be resolved in favor of presumed constitutionality, we conclude that Sullivan III, like Sullivan II, does not relate to health or sanitation and, therefore, we hold that Sullivan III does not violate Article II, Section 24(1)(a) of the North Carolina Constitution.

## 2. Regulating trade

Subclause (j) of Article II, Section 24, Clause 1 provides that "[t]he General Assembly shall not enact any local, private, or special act or resolution . . . [r]egulating labor, trade, mining, or manufacturing." N.C. Const. art. II, § 24, cl. 1(j). "In interpreting the meaning of Article II, section 24[(1)](j), [the Supreme] Court has previously defined the word 'trade' to mean a business venture for profit and includes any employment or business embarked in for gain or profit." *Cheape*, 320 N.C. at 558, 359 S.E.2d at 798 (internal quotation marks omitted); *see also High Point Surplus Co.*, 264 N.C. at 655, 142 S.E.2d at 701-02 ("An act which restricts or regulates the operation, engaging in or carrying on of business . . . *regulates trade*."). "The verb 'to regulate' has been defined as meaning to govern or direct according to *rule*, . . . to bring under *control* of law or constituted authority." *Cheape*, 320 N.C. at 559, 359 S.E.2d at 798 (internal quotation marks omitted). Thus, "[b]efore a local act will fall under the prohibition of Article II, section 24[(1)](j), its provisions must fairly be said to 'regulate trade' as defined herein." *Id.*

The Supreme Court has also determined that the term "trade" "refers to commerce *engaged in by citizens of the State, and not a* restricted activity *conducted by the State itself.*" *Gardner v. City of Reidsville*, 269 N.C. 581, 591-92, 153 S.E.2d 139, 148 (1967) (emphasis added). The Court has further stated that "cities[] exist solely as political subdivisions of the State and are creatures of statute [enacted by the General Assembly]," *Davidson County v. City of High Point*, 321 N.C. 252, 257, 362 S.E.2d 553, 557 (1987), and so have "no inherent powers, and can exercise only such powers as are expressly conferred by the General Assembly and such as are necessarily implied by those expressly given." *High Point Surplus Co.*, 264 N.C. at 654, 142 S.E.2d at 701; *see also Cheape*, 320 N.C. at 560, 359 S.E.2d at 798 ("A municipality, . . . being merely a creature of the General Assembly with the ability to exercise only those powers expressly conferred upon it and those necessarily implied thereby, may require a specific grant of power before it has the capacity to engage in otherwise permissible activities.") (citation omitted).

Asheville argues that when a municipality is operating in a proprietary capacity, a municipality must be treated by the General Assembly in the same manner as a business or private corporation. In support of this assertion, Asheville cites the following language from *Piedmont Aviation*: "[T]he managing board of the [municipal airport a]uthority, [acting in its proprietary capacity] in determining landing fees and rentals which it will charge the users of its facilities, acts as does the board of directors of a private corporation owning and operating a like facility." *Piedmont Aviation*, 288 N.C. at 103, 215 S.E.2d at 555. However, it is our opinion that Asheville construes this language more broadly than its context supports:

> Thus, the managing board of the Authority, in determining landing fees and rentals which it will charge the users of its facilities, acts as does the board of directors of a private corporation owning and operating a like facility, *subject only to limitations imposed upon it by statute* or by contractual obligations assumed by it. Our attention has been directed to no statutory limitation imposed upon the Authority in the matter of fixing landing fees and rentals except the provision in Ch. 755 of the Session Laws of 1959 authorizing the Authority to charge "reasonable and adequate" fees and rents, and the provision of G.S. § 63-53(5) stating that the charges for the use of its properties "shall be reasonable and uniform for the same class of service and established with due regard to the property and improvements used and the expense of operation to the municipality." No provision in these statutes requires that the Authority conduct a hearing, receive evidence and make findings of fact or that it follow any other procedural course in determining the landing fees or rentals to be charged by it. Nothing in these statutes requires the Authority to give notice to present or prospective users of its properties that the Authority is contemplating a change in such fees and rental charges. The petitioners were notified of the increases more than three months before they were to become effective.

*Id.* (emphasis added). We interpret this full excerpt to mean that, while acting in its proprietary capacity, the municipal airport authority was not bound by the legislative enactments at issue in *Piedmont Aviation* to provide notice and a hearing while it was *considering* what fees it would charge users for landing fees or rentals; instead, it was bound only by the limiting enabling statutes that mandated the fees be "reasonable," "adequate," and "uniform." In

other words, but for the limiting enabling statutes, the municipality was not accountable to its users while it considered what fees it would charge and, *in that way only*, it had discretion similar to that of "the board of directors of a private corporation owning and operating a like facility." *See id.*

Asheville cites no other authority to support its assertion that, when a municipality acts in its proprietary capacity, it is no longer a political subdivision of the State, but rather *becomes* a citizen of the State and must be treated in the same manner as a business or private corporation, and we are not persuaded by its argument. Therefore, we hold that Asheville, acting in its proprietary capacity to operate the water distribution system, is not a citizen of the State engaging in "trade" for the purpose of Article II, Section 24(1)(j) of the North Carolina Constitution. Asheville's assignments of error that Sullivan II and III violate Article II, Section 24(1)(j) are overruled.

### III.

Asheville next contends the trial court erred by concluding that Sullivan II and III do not (A) violate the rule established in *Asbury v. Town of Albemarle*, 162 N.C. 247, 78 S.E. 146 (1913), and (B) violate the "law of the land" clause set out in Article I, Section 19 of the North Carolina Constitution.

### A.

[7] In *Asbury*, the Court heard an action in which the owner of a private waterworks plant ("plaintiff") sought to enjoin a municipality from constructing its own municipal waterworks. Plaintiff complained that the municipality was in violation of a general law known as the Battle Act, which provided:

> [W]henever any incorporated town or city, which under this or by special act has been or may be authorized, from the sale of bonds, or otherwise, to build, operate, and maintain a public waterworks . . . there shall have been constructed in said town or city by any private or *quasi*-public corporation . . . waterworks . . . then in active operation and serving the public, which construction or operation was authorized by said town or city . . . then before constructing any proposed system of waterworks . . . heretofore or hereafter authorized by law, along or upon the streets occupied by such private or *quasi*-public corporation, the town or city within which such utilities are located and owned, proposing to build any public system of

> waterworks, shall, before undertaking to do so, first acquire, either by purchase or condemnation, the property of such system already laid, operated, and maintained by such private or *quasi*-public corporation.

*Asbury,* 162 N.C. at 248, 78 S.E. at 147-48 (omissions in original). After a ruling for plaintiff at trial, the municipality appealed, challenging the "constitutionality of the [Battle Act] as being an invasion of the rights of municipal corporations under the organic law." *Id.* at 252, 78 S.E. at 149. The Court stated that compelling the municipality to purchase plaintiff's system of waterworks "would be *to take the money of the taxpayers and devote it to a private use* exclusively, and to give something for nothing—a result not contemplated by the statute." *Id.* (emphasis added). The Court stated that, "[i]f this be a valid exercise of legislative authority, then the right to exercise its own discretion in a purely local matter is taken from the municipality *and the money of the taxpayers may be donated to a private concern.*" *Id.* (emphasis added). Thus, the Court reasoned that, as a result of this legislation, "the city may be compelled [by the General Assembly] to purchase something which, according to the judgment of its own authorities, is of no sort of value or use to it." *Id.* The Court held that "the statute under consideration is void in so far as it attempts to control the exercise of discretion by the defendant in the management of its purely private and property rights." *Id.* at 256-57, 78 S.E. at 151.

In the present case, Asheville contends Sullivan II and III "impermissibly intrude" on the decision-making authority of Asheville with respect to its purely proprietary and private activities, and directs our attention to the following excerpt from *Asbury*:

> It may be admitted that corporations . . . such as . . . cities, may in many respects be subject to legislative control. But it will hardly be contended that even in respect to such corporations the legislative power is so transcendent that it may, at its will, take away the private property of the corporation, or change the uses of its private funds acquired under the public faith.

*Id.* at 253-54, 78 S.E. at 149-50 (omissions in original) (internal quotation marks omitted). Asheville argues that Sullivan II and III achieve the same purpose of the Battle Act, specifically to compel the municipality to enter into a contract with another party which the municipality "deem[s] to be disadvantageous" and not in its best interests. Asheville suggests that the private entity which tried to compel the

municipality to give taxpayer money to its own private interest in *Asbury* is analogous to Buncombe County "procur[ing]" legislation that would secure for it all of the benefits enjoyed under the Water Agreement, without imposing upon Buncombe County any of the same responsibilities that had existed under the former contract. We are not persuaded that *Asbury* is analogous to the present case in the way that Asheville espouses.

The matter before the Court in *Asbury* was a cause of action arising out of "a result not contemplated by the [Battle Act]," wherein the General Assembly had effectively compelled the municipality "to take the money of [its] taxpayers and devote it to a private use exclusively"—to purchase a privately-owned waterworks facility which the municipality had determined to be "of no sort of value or use to it" because its capacity was well below that which the municipality required. *See id.* at 251-52, 78 S.E. at 149. Here, under Sullivan II and III, the General Assembly does not compel, either directly or indirectly, the transfer of taxpayer money to a private corporation to procure property from which its citizens do not derive a useful benefit. Additionally, neither Sullivan II nor Sullivan III compel Asheville to continue to operate the water distribution system and as such do not compel the use of taxpayer money for this public enterprise if Asheville determines that operating the water distribution system is no longer profitable to the municipality or its citizens. Further, as Sullivan II does not impose an upper limit on the rates Asheville may charge its consumers—requiring only that the rates charged for each classification of water consumer be uniform—Asheville is not forbidden to set the price for its service that it believes is necessary to yield a fair return on its property. For the same reason, Asheville is not prevented by either Sullivan II or III from offering its water services on whatever terms and conditions it believes are necessary to protect the operational and financial integrity of the system.

Asheville states that Sullivan II forbids it from giving preference in water rates to Asheville's citizens and taxpayers over Buncombe County citizens who reside outside Asheville's corporate limits. Asheville further asserts that, under Sullivan III, it is forbidden even to enjoy the profits from its property, being told that it may not use those profits for the benefit of Asheville's citizens in the manner thought best by the City Council of Asheville. Although we cannot disagree with these statements, "[i]t is critical to our system of government and the expectation of our citizens that the courts not assume the role of legislatures. . . . [J]udges have not been entrusted

by the people of this State to be legislators." *State v. Arnold*, 147 N.C. App. 670, 673, 557 S.E.2d 119, 121 (2001), *aff'd per curiam*, 356 N.C. 291, 569 S.E.2d 648 (2002). Accordingly, the power of this Court is limited to carrying out its duty "to examine a statute and determine its constitutionality when the issue is properly presented." *Id.* Since we do not agree with Asheville that Sullivan II and III are unconstitutional for the same reason that the Battle Act was unconstitutional in *Asbury*, we hold that Sullivan II and III do not violate the rule announced in *Asbury*.

### B.

[8] Next, Asheville contends the trial court erred by concluding that Sullivan II and III do not violate the "law of the land" clause of Article I, Section 19 of the North Carolina Constitution. For the reasons stated below, we conclude that Asheville has abandoned this assignment of error.

Article I, Section 19 of the Constitution of North Carolina provides, in part, that "[n]o person shall be . . . in any manner deprived of his life, liberty, or property, but by the law of the land." N.C. Const. art. I, § 19. The North Carolina "law of the land" clause is interpreted to be analogous with the Fourteenth Amendment "due process of law" clause. *See Treants Enter., Inc. v. Onslow County*, 83 N.C. App. 345, 351, 350 S.E.2d 365, 369 (1986), *aff'd by* 320 N.C. 776, 360 S.E.2d 783 (1987); *see also Mark IV Beverage, Inc. v. Molson Breweries USA, Inc.*, 129 N.C. App. 476, 486, 500 S.E.2d 439, 446, *disc. review denied*, 349 N.C. 231, 515 S.E.2d 705 (1998). These clauses " 'have been consistently interpreted to permit the state, through the exercise of its police power, to regulate economic enterprises provided the regulation is rationally related to a proper governmental purpose.' " *Mark IV Beverage, Inc.*, 129 N.C. App. at 486, 500 S.E.2d at 446 (quoting *Poor Richard's, Inc. v. Stone*, 322 N.C. 61, 64, 366 S.E.2d 697, 699 (1988)). "A single standard has traditionally determined whether legislation . . . violate[s] the 'law of the land' clause: the law must have a rational, real and substantial relation to a valid governmental objective (i.e., the protection of the public health, morals, order, safety, or general welfare)." *Treants Enter., Inc.*, 83 N.C. App. at 352, 350 S.E.2d at 369-70. "The inquiry is thus two-fold: (1) Does the regulation have a legitimate objective? and (2) If so, are the means chosen to implement that objective reasonable?" *Id.* at 352, 350 S.E.2d at 370.

As the party challenging the constitutionality of the statute, Asheville has the burden of establishing its unconstitutionality. *See In re House of Raeford Farms, Inc. v. Brooks*, 63 N.C. App. 106, 109, 304 S.E.2d 619, 621 (1983), *disc. review denied*, 310 N.C. 153, 311 S.E.2d 291 (1984). In its brief, Asheville makes no argument challenging Sullivan II or III under the "law of the land" clause. For example, Asheville does not identify the relevant text of the constitutional provision it challenges; it does not identify the standard or test upon which courts must rely to determine whether a legislative act is violative of the "law of the land" clause; and most importantly, Asheville does not provide any argument as to *why* this Court should hold that Sullivan II and III do not "have a rational, real and substantial relation to a valid governmental objective." *See Treants Enter., Inc.*, 83 N.C. App. at 352, 350 S.E.2d at 369-70. In the section of its brief in which this assignment of error is referenced, Asheville directs its complete attention to arguing Assignment of Error 7, regarding its contention that Sullivan II and III violate the rule announced in *Asbury*, as addressed in section III(A) above. Asheville's only mention of the "law of the land" clause in this section of its brief is relegated to a footnote, which states:

> The trial court's only discussion of Article I, § 19 missed the mark completely, making the point that the Sullivan Acts do not violate the "equal protection" component of the constitutional provision. But *Asbury*, and Asheville's claim based on the case, are not grounded on the concept of equal protection but instead the doctrine of due process.

The Rules of Appellate Procedure "govern procedure in all appeals from the courts of the trial division to the courts of the appellate division," N.C.R. App. P. 1(a) (2008), and specify the required content in the parties' briefs. *See* N.C.R. App. P. 28. "It is not the role of the appellate courts . . . to create an appeal for an appellant." *Viar v. N.C. Dep't of Transp.*, 359 N.C. 400, 402, 610 S.E.2d 360, 361 (per curiam), *reh'g denied*, 359 N.C. 643, 617 S.E.2d 662 (2005). Since "[q]uestions raised by assignments of error in appeals from trial tribunals but not then presented and discussed in a party's brief, are deemed abandoned," N.C.R. App. P. 28(a), we conclude that Asheville has abandoned this assignment of error.

IV.

[9] Finally, Asheville contends the trial court erred by rejecting its argument that section 1 of Sullivan III unconstitutionally creates spe-

cial privileges for an ineligible class of persons in violation of the exclusive emoluments prohibition contained in Article I, Section 32 of the North Carolina Constitution. Asheville argues that Sullivan III's modifications of N.C.G.S. § 160A-312(a) create a special class of persons upon whom an unparalleled benefit is conferred by allowing property owners in Buncombe County located outside the City of Asheville who buy water from Asheville to sue the City to recover damages in an action for negligence in the event Asheville fails to supply sufficient quantities of water for their uses and purposes. For the reasons discussed below, we overrule this assignment of error.

Article I, Section 32 of the North Carolina Constitution provides that "[n]o person or set of persons is entitled to exclusive or separate emoluments or privileges from the community but in consideration of public services." N.C. Const. art. I, § 32. The purpose of this constitutional provision, as articulated by our Supreme Court, is "to prevent 'the community' from surrendering its power to another 'person or set of persons' by grant of exclusive or separate emoluments or privileges unless they are granted 'in consideration of public services.' It is not retention of powers but alienation of powers that is prohibited." *Madison Cablevision, Inc. v. City of Morganton*, 325 N.C. 634, 655, 386 S.E.2d 200, 212 (1989). A statute which confers an exemption that benefits a particular group of persons is not an exclusive emolument or privilege within the meaning of Article I, Section 32 if: "(1) the exemption is intended to promote the general welfare rather than the benefit of the individual, and (2) there is a reasonable basis for the legislature to conclude the granting of the exemption serves the public interest." *Emerald Isle*, 320 N.C. at 654, 360 S.E.2d at 764. "Our case law, however, teaches that not every classification which favors a particular group of persons is an 'exclusive or separate emolument or privilege' within the meaning of the constitutional prohibition." *Lowe v. Tarble*, 312 N.C. 467, 470, 323 S.E.2d 19, 21 (1984), *aff'd on reh'g*, 313 N.C. 460, 329 S.E.2d 648 (1985). Accordingly, we must first determine whether Sullivan III's modifications to N.C.G.S. § 160A-312(a) confer an exclusive benefit on Buncombe County water consumers who live outside of Asheville's city limits.

Prior to Sullivan III, and as it currently applies to all municipalities except Asheville, N.C.G.S. § 160A-312(a) provides:

A city shall have authority to acquire, construct, establish, enlarge, improve, maintain, own, operate, and contract for the oper-

ation of any or all of the public enterprises as defined in this Article *to furnish services to the city and its citizens.* Subject to Part 2 of this Article, a city may acquire, construct, establish, enlarge, improve, *maintain, own, and operate any public enterprise outside its corporate limits, within reasonable limitations, but in no case shall a city be held liable for damages to those outside the corporate limits for failure to furnish any public enterprise service.*

N.C. Gen. Stat. § 160A-312(a) (emphasis added). As it currently applies to Asheville following Sullivan III, N.C.G.S. § 160A-312(a) provides:

A city shall have authority to acquire, construct, establish, enlarge, improve, maintain, own, operate, and contract for the operation of any or all of the public enterprises as defined in this Article *to furnish services to the city and its citizens and other areas and their citizens located outside the corporate limits of the city.* Subject to Part 2 of this Article, a city may acquire, construct, establish, enlarge, improve, *maintain, own, and operate any public enterprise outside its corporate limits, within reasonable limitations.*

Sullivan III, ch. 139, 2005 N.C. Sess. Laws 243 (emphasis added). As discussed in section II(B)(1) above, Sullivan III applies only to the water distribution system Asheville operates in its proprietary capacity. Therefore, we must determine whether the Sullivan III modifications that allow water consumers located outside Asheville's corporate limits to hold Asheville liable for its failure to furnish water service actually confer an exclusive benefit on non-city consumers which is not available to water consumers located within Asheville's corporate limits.

At the outset of its argument under this assignment of error, Asheville states that, "[u]nder well-established doctrine," Asheville cannot be held liable in negligence for failure to supply a sufficient quantity of water to its own citizens, i.e., those water consumers located within its corporate limits. Asheville states that this rule "is an instance of the common law 'public duty' doctrine," which holds that a governmental entity cannot be sued in negligence "on account of its failure to perform a duty which it owed to the public generally and equally." *See generally Multiple Claimants v. N.C. Dep't of Health & Hum. Servs.,* 361 N.C. 372, 646 S.E.2d 356 (2007) (defining the rule of the common law public duty doctrine—that a municipality

will *not* be held liable when performing certain *governmental* functions—first articulated in *Braswell v. Braswell*, 330 N.C. 363, 410 S.E.2d 897 (1991), *reh'g denied*, 330 N.C. 854, 413 S.E.2d 550 (1992), identifying its purpose and its two exceptions, and chronicling its limited expansion and clarification under *Stone v. N.C. Dep't of Labor*, 347 N.C. 473, 495 S.E.2d 711, *cert. denied*, 525 U.S. 1016, 142 L. Ed. 2d 449 (1998), *Hunt v. N.C. Dep't of Labor*, 348 N.C. 192, 499 S.E.2d 747 (1998), and *Myers v. McGrady*, 360 N.C. 460, 628 S.E.2d 761 (2006)). Asheville posits that Sullivan III confers a benefit on non-city water consumers which the public duty doctrine effectively disallows for its own citizens and property taxpayers. In support of this suggestion, Asheville directs this Court's attention to *Howland v. City of Asheville*, 174 N.C. 749, 94 S.E. 524 (1917), and *Mabe v. City of Winston-Salem*, 190 N.C. 486, 130 S.E. 169 (1925). However, based on the facts of the present case, we believe Asheville's reliance on these cases to sustain its argument is misplaced.

*Howland* and *Mabe* each involved claims made against a municipality by plaintiffs who alleged that the municipality's failure to provide sufficient water pressure from, and unobstructed access to, water hydrants connected to the municipally-owned waterworks system resulted in the negligent destruction of their homes by fire. In *Howland*, the Court concluded that when a city is exercising a governmental function "solely for the benefit of the public, *it incurs no liability for the negligence of its officers*; though acting under color of office, unless some statute [expressly or by necessary implication] subjects the corporation to pecuniary responsibility for such negligence." *Howland*, 174 N.C. at 806, 94 S.E. at 525 (emphasis added) (alteration in original) (internal quotation marks omitted); *see also id.* (Clark, C.J., concurring) ("[W]here a city or town is maintaining a system of municipal waterworks[,] . . . *the liability* of the municipality to employees, to the public, to patrons and to any others *is the same as a privately owned water company*, for the reason that *the municipality is then operating a business enterprise, and not governmentally*.") (emphasis added). In *Mabe*, the Court similarly concluded that the municipality could not be held liable for damage to plaintiff's home because it was acting in its governmental capacity. *See generally Mabe*, 190 N.C. 486, 130 S.E. 169 (1925).

As we have addressed throughout this opinion, and according to the words of its own brief, Asheville "ha[s] *repeatedly emphasized*" that the sale of water outside a municipality's limits is discretionary and not part of any public duty; it is done for profit and "not as a

means of regulating anything." (Emphasis added.) In fact, as we discussed in section I above, Asheville built its challenge to the Court's holding in *Candler* around its assertion that the Court erroneously concluded that Asheville's operation of its water distribution system was a *governmental, rather than a proprietary*, function. However, since *Howland* and *Mabe* held that the municipalities were not liable to plaintiffs *because* the Court determined that the municipality-owned systems were operated in their *governmental, not proprietary* capacities, *Howland* and *Mabe* and the public duty doctrine can *only* be relevant to this assignment of error *if* Asheville is contending that the operation of its water distribution system is a governmental, rather than proprietary, function.

We believe that *Bowling v. City of Oxford*, 267 N.C. 552, 148 S.E.2d 624 (1966), states the rule that is relevant to determining whether Sullivan III confers a benefit on non-city water consumers which Asheville's own citizens may not demand from the City:

> When a city or town engages in an activity which is not an exercise of its governmental function but is proprietary in nature, the city, like an individual or a privately owned corporation engaged in the same activity, is liable in damages for injury to persons or property due to its negligence or other wrongful act in the conduct of such activity. . . .
>
> . . . .
>
> When a municipal corporation operates a system of waterworks for the sale by it of water for private consumption and use, it is acting in its proprietary or corporate capacity and is liable for injury or damage to the property of others to the same extent and upon the same basis as a privately owned water company would be.

*Bowling*, 267 N.C. at 557, 148 S.E.2d at 628. Since the public duty doctrine and the immunity it grants Asheville and other municipalities from liability in tort by its own citizens is not applicable to a municipality's operation of a *proprietary* activity, we find that Sullivan III's modifications to N.C.G.S. § 160A-312(a) effectively put Asheville's non-city water consumers on equal footing with Asheville's city water consumers. Section 1 of Sullivan III simply allows Asheville to be held liable in tort by *all* water consumers of its proprietary water distribution system according to the rule stated in *Bowling*. Thus, we conclude that the modifications to N.C.G.S. § 160A-312(a) under Sullivan

III do not invoke Article I, Section 32 of the North Carolina Constitution because the modifications do not confer an exclusive benefit on water consumers located outside Asheville's corporate limits which is not already shared by water consumers located within Asheville's corporate limits.

The trial court's order granting defendants' cross-motions for summary judgment and denying Asheville's motion for summary judgment is affirmed.

Affirmed.

Judges STEELMAN and STEPHENS concur.